**AMERICAN PROTEIN CORPORATION,**
Plaintiff–Appellee,

v.

**AB VOLVO and Volvo Lastvagnar AB, as successors in interest to Beijerinvest AB, Beijer Industries, Inc. and Bo Lycke, Defendants–Appellants.**

No. 331, Docket 87–7560.

United States Court of Appeals,
Second Circuit.

Argued Dec. 3, 1987.

Decided April 8, 1988.

Frederick L. Whitmer, Morristown, N.J. (Dinah H. Bourne, Betsy L. Weiss, Pitney, Hardin, Kipp & Szuch, Morristown, N.J., of counsel), for defendants-appellants AB Volvo, Volvo Lastvagnar AB, and Bo Lycke.

Daniel A. Pollack, New York City (Pollack & Kaminsky, New York City, of counsel), for plaintiff-appellee American Protein Corp.

Milton D. Andrews, Washington, D.C. (Lance E. Tunick, D. Bruce Sewell, Charles H. Lockwood, II, Gen. Counsel, John T. Whatley, Asst. Gen. Counsel, Schnader, Harrison, Segal & Lewis, Washington, D.C., of counsel), filed a brief on behalf of the Automobile Importers of America, Inc. as amicus curiae.

Before NEWMAN, CARDAMONE, and PIERCE, Circuit Judges.

CARDAMONE, Circuit Judge:

We are presented on this appeal with the issue of when the contractual default of a subsidiary corporation may be visited upon its parents. The question takes on added importance because the parents are Swedish corporations without a presence in New York but nonetheless were held liable for the obligations of their New York subsidiary. Legal liability was fastened on one foreign parent in part because the corporate veil between it and its subsidiary was pierced. The primary liability of the parents was based on the fact that two of one parent's officers and directors—also directors of the subsidiary—came to New York and voted at the subsidiary's Board of Directors meeting to "wind down" the subsidiary's affairs, resulting in the subsidiary's default on a contract. Of course, it is entirely appropriate for directors of a parent corporation to serve as directors of its subsidiary, and that fact alone may not serve to expose the parent corporation to liability for its subsidiary's acts. Here, other facts in addition to interlocking directorates are alleged.

## BACKGROUND

### A. *Facts*

This diversity case arises from the breach of a contract for the sale of edible dried blood derived from the slaughter of cattle and pork. Plaintiff, American Protein Corporation (American Protein), brought the instant action in the Southern District of New York against the defendants AB Volvo and Volvo Lastvagnar AB (Lastvagnar) (formerly Beijerinvest AB), Beijer Industries, Inc., and Bo Lycke.

American Protein is an Iowa corporation with its principal place of business at Lytton, Iowa. Defendant Volvo is Sweden's largest corporation, with its principal place of business in Gothenburg, Sweden. In May 1982 Volvo acquired Beijerinvest AB

and changed its name to Volvo Lastvagnar AB which, operating as a wholly owned subsidiary of Volvo, is located in Stockholm. Lastvagnar (f/k/a Beijerinvest) owns 100 percent of the stock of Beijer, Handel & Industri, a Swedish corporation which owns 100 percent of the stock of defendant Beijer Industries, Inc., a New York corporation. Beijer, Inc.—also a New York corporation—was, in turn, a wholly-owned subsidiary of Beijer Industries. Volvo is therefore the parent of all the members of the Beijer family of corporations.

Walter Lauridsen, an agronomist living in Iowa, had for 20 years been interested in utilizing the blood run-off from the slaughter of cattle and pork as a source of protein for humans. Over the years he had developed a concept of spray-drying the blood into a powdered form which, when combined with water, creates a bouillon-like food fit for human consumption. To effectuate his ideas, Mr. Lauridsen organized American Protein. In 1980 he contacted Beijer, Inc. with his idea. The principals of that company expressed interest in his project and invited him to New York City to discuss it further. There he met with defendant Lycke, president of Beijer, Inc., who, according to Lauridsen, told him that Beijer's Swedish parent would back a contract, take all of his output, and use its world-wide marketing capacity to distribute the dried blood product.

Prior to signing a contract Lauridsen asked for a written guarantee from Beijer, Inc.'s (great grand)parent corporation, Beijerinvest, for the performance of Beijer, Inc.'s obligation. Lycke told Lauridsen that no such guarantee could be given. Subsequently, on March 2, 1982 American Protein and Beijer, Inc. entered into a three-year, fixed price, outputs contract for the sale of edible dried blood. The agreement provided practically all of American Protein's business as Beijer, Inc. was to purchase the entire output of blood products from American Protein's Lytton, Iowa plant. Lauridsen put up his own and borrowed funds—totalling nearly $1 million— to convert an old dairy into a sanitary spray-drying plant capable of producing a product fit for human consumption and made commitments to buy the blood run-off from a slaughterhouse. The March 2d contract forms the basis of the instant action.

About two months after Beijer, Inc. contracted with American Protein—on May 11, 1982—Volvo purchased Beijerinvest and, therefore, the Beijer family of companies. After a number of months of performing the contract—and continuously losing money—Beijer, Inc. ran out of cash and stopped buying and paying for the dried blood product. On October 19, 1982 the Board of Directors of Beijer, Inc. met in New York and discussed the corporation's finances and business prospects. At the same meeting, the status of the dried blood project and Beijer, Inc.'s general marketing efforts were reviewed. As a result, the Board decided not to take on any new business, but instead voted to "wind down" Beijer, Inc.'s activities. All of the members of the Board—Bo Lycke, as Beijer, Inc.'s president; Pehr Gyllenhammar, chief executive officer of Volvo; and Ulf Linden, another high ranking officer of Volvo— were present.

On December 31, 1982 Lycke sold Beijer, Inc. to a company controlled by Lyster Carney, a former employee of Beijer, Inc. for $1,000 plus a $2 million note. Carney, in turn, went to Lauridsen and told him that if he would not renegotiate the blood products contract and take over the marketing function Carney would have to declare bankruptcy. Lauridsen attempted without success to obtain redress in Iowa against Carney's company.

### B. *Proceedings Below*

American Protein then sued Volvo, Lastvagnar, and Lycke in the instant action. In a seven-count complaint filed in 1984 plaintiff sought recovery of damages from defendants Volvo, Lastvagnar, and Beijer Industries for breach of express written contract (Count I), from Volvo and Lastvagnar for breach of express oral contract (Count II), for breach of implied contract (Count III), for breach of an alleged quasi-contract (Count IV), and for tortious inter-

ference with contractual relations (Count V), and from defendant Lycke for fraud (Count VI) and negligent misrepresentation (Count VII).

The case was tried before district court Judge Howard B. Turrentine (formerly Chief Judge for the Southern District of California) and a jury from May 21 to May 26, 1987. At the close of the evidence the trial court dismissed the claim for quasi-contract (Count IV). It also dismissed the contract claims alleged in Counts I, II and III against Volvo. No cross-appeal has been taken by plaintiff from those dismissals. All the other claims were submitted to the jury. The jury returned a $3 million verdict for the plaintiff against Volvo for tortious interference with the contract (Count V), against Lastvagnar for breach of contract (Counts I, II and III) and for tortious interference (Count V), and against Lycke for negligent misrepresentation (Count VII), but not for fraud (Count VI). Beijer Industries, the parent of Beijer, Inc. was charged only in Count I and none of the damages awarded plaintiff were assessed against Beijer Industries. Compensatory damages were awarded plaintiff in the amount of $1 million against Volvo, $1.8 million against Lastvagnar and $200,-000 against Lycke.

On May 29, 1987 all defendants moved unsuccessfully for judgment n.o.v. or, in the alternative, for a new trial. A judgment was entered on June 1, 1987 and an amended judgment was entered on June 16, 1987 that computed prejudgment interest in accordance with Iowa law. Defendants appealed this adverse judgment on June 26, 1987.

### DISCUSSION

Defendants raise a number of arguments. Volvo and Lastvagnar claim that plaintiff lacked jurisdiction over them and that the evidence does not support the verdict finding them liable for tortious interference with plaintiff's contract; Lastvagnar contends that the issue of piercing the corporate veil should have been decided by the trial court rather than the jury, and that, in any event, there was insufficient

evidence to submit this issue to a jury; Lycke claims that he was erroneously found liable for misrepresentation; and, finally, all argue that the damage award lacks a sound basis. Analysis of these issues will be set forth in a discussion of Counts I, II, III, V and VII of the complaint.

### I

The first three counts charged defendant Lastvagnar with breach of an express written, an express oral, and an implied contract. Plaintiff's success on these three counts is evidenced by the $1.8 million verdict it obtained against Lastvagnar, the (great grand)parent of the now-defunct Beijer, Inc., the original contracting party. The predicate for success on the express written contract count (Count I) resulted from the trial court's submitting to the jury the question of whether the corporate veil between Beijer, Inc. and Lastvagnar should be pierced.

Lastvagnar's first contention is that piercing the corporate veil, as an equitable remedy, must be decided by the court and not the jury, as occurred in the trial below. Such is not the law. Granted, the relief is equitable in nature, that is, imposing the remedy redresses a wrong by the expedient of ignoring the legal fiction that a corporation's existence is separate from that of its owner. Yet Lastvagnar cites no case to support its position and, in fact, the issue of corporate disregard is generally submitted to the jury. *See, e.g., Walter E. Heller & Co. v. Video Innovations, Inc.*, 730 F.2d 50, 53 (2d Cir.1984) (listing appropriate criteria for jury to decide whether corporate veil should be pierced); *FMC Fin. Corp. v. Murphree*, 632 F.2d 413, 421 & n. 5 (5th Cir.1980) (collecting cases); *see generally Byrd v. Blue Ridge Rural Elec. Coop.*, 356 U.S. 525, 537, 78 S.Ct. 893, 900, 2 L.Ed.2d 953 (1958) (jury resolution of disputed question of fact in diversity cases favored). Accordingly, submission of this issue to the jury was not error.

Turning to appellant's second argument, that the evidence on the issue of piercing

the corporate veil was insufficient to go to the jury, we begin with several legal propositions. A corporation is an entity that is created by law and endowed with a separate and distinct existence from that of its owners. Because a principal purpose for organizing a corporation is to permit its owners to limit their liability, there is a presumption of separateness between a corporation and its owners, *see, e.g., Crown Cent. 'Petroleum v. Cosmopolitan Shipping Co.,* 602 F.2d 474, 476 (2d Cir.1979), which is entitled to substantial weight. Further, disregarding corporate separateness as an equitable remedy is one that differs with the circumstances of each case. *See FMC Fin. Corp.,* 632 F.2d at 422.

Because the arguments in this diversity case are made under New York law, we look to that forum to see when a parent may be held liable for the acts of its subsidiary. Control is the key. The parent must exercise complete domination "in respect to the transaction attacked" so that the subsidiary had "at the time" no separate will of its own, and such domination must have been used to "commit fraud or wrong" against plaintiff, which proximately caused plaintiff's injury. *Lowendahl v. Baltimore & Ohio R.R.,* 247 A.D. 144, 157, 287 N.Y.S. 62 (1st Dept.), *aff'd,* 272 N.Y. 360, 6 N.E.2d 56 (1936), *quoted with approval in Gorrill v. Icelandair/Flugleidir,* 761 F.2d 847, 853 (2d Cir.1985). To satisfy the control element, American Protein must have demonstrated by a preponderance of the evidence that Beijer, Inc. was controlled and dominated by Lastvagnar with respect to its contract for dried blood to such an extent that it had no separate will of its own or, stated another way, that Beijer, Inc. was a mere instrumentality of its parent. To meet the second element, plaintiff must show that Beijer, Inc. was used by Lastvagnar to commit a fraud or wrong that caused American Protein unjustly to suffer a loss. *See Williams v. McAllister Bros.,* 534 F.2d 19, 21 (2d Cir.1976).

■ Factors indicating that a parent corporation controls its subsidiary include lack of normal corporate formality in the sub-sidiary's existence, under-capitalization, and personal use of the subsidiary's funds by the parent or owner. *See Walter E. Heller & Co.,* 730 F.2d at 53. The record reveals that none of these factors were present in the instant case. Beijer, Inc. maintained its own corporate and financial records, held independent board meetings, and maintained separate corporate offices. While concededly Lastvagnar supplied its subsidiary with working capital from time to time, there is no evidence that Beijer, Inc. received such financing specifically for the dried blood project. Nor did Lastvagnar make use of Beijer, Inc.'s corporate funds for its own benefit.

The strongest piece of evidence to support control was the existence of interlocking directorates. This commonplace circumstance of modern business does not furnish such proof of control as will permit a court to pierce the corporate veil. *See Berger v. Columbia Broadcasting Sys.,* 453 F.2d 991, 995 (5th Cir.) (subsidiary's board's being completely comprised of employees of parent is insufficient basis to pierce corporate veil), *cert. denied,* 409 U.S. 848, 93 S.Ct. 54, 34 L.Ed.2d 89 (1972). Beyond that, American Protein presented no evidence to suggest that Lastvagnar used Beijer, Inc. to commit a fraud or wrong causing American Protein to suffer an unjust loss. Without more reasons to disregard corporate separateness than those shown here, a subsidiary's default may not cast its shadow of liability on its parent. Accordingly, we reverse the verdict against Lastvagnar on Count I.

## II

■ Lastvagnar's liability on Counts II (breach of express oral contract) and III (breach of implied oral contract) was predicated on the theory that Lycke guaranteed to American Protein that Beijerinvest would guarantee Beijer's performance of the contract. Under Count II, Lycke allegedly acted on behalf of Beijerinvest. Under Count III, Beijerinvest's knowledge of Lycke's action created an implied contract without resort to an agency theory. Overlooking the inherent logical contradiction in

a finding of liability on *both* of these counts, the evidence was insufficient to establish that Lycke made any guarantee to American Protein. A contrary conclusion cannot stand in light of the facts that Lauridsen requested that Beijerinvest guarantee Beijer, Inc.'s performance and that Lycke informed him that no such guarantee could be given. The verdict against Lastvagnar on Counts II and III therefore is also reversed.

### III

We turn now to Count V, which alleged that Volvo and Lastvagnar tortiously interfered with American Protein's contract with Beijer. The jury found such interference by both parties and awarded plaintiff $1 million against Volvo and, presumably, a portion of the total $1.8 million verdict against Lastvagnar. Before analyzing the merits of this claim, a threshold issue must be considered. American Protein argues that the defendants are not entitled to raise this issue on appeal because they failed to move for a directed verdict at the close of all the evidence pursuant to Fed.R.Civ.P. 50(b).

### A. *Compliance With Fed.R.Civ.P. 50(b)*

■ Rule 50(b) provides "[w]henever a motion for a directed verdict made at the close of all the evidence is denied or for any reason is not granted, the court is deemed to have submitted the action to the jury subject to a later determination of the legal questions raised by the motion." A motion for judgment n.o.v. after the jury's verdict generally may be made under this Rule only when a motion for a directed verdict has been made at the close of all the evidence and before the case is sent to the jury. *See* Fed.R.Civ.P. 50(b) advisory committee's note. One of the main reasons for the rule, of course, is to give the nonmoving party notice of defects in its proof so that it can cure the deficiencies before the case is submitted.

It is undisputed on this record that defendants made an appropriate motion for a directed verdict of dismissal at the close of the plaintiff's evidence on the same grounds as those later asserted in their judgment n.o.v. motion, including the tortious interference ground. After plaintiff rested and defendants made the motion to dismiss, the trial judge reserved decision. Later, it ruled on the motion at the close of all the evidence, specifically denying the motion with regard to the tortious interference claim. When defendants made the judgment n.o.v. motion the experienced district judge stated to defendants' counsel that he "thought" they had "preserved [their] right" to make the postjudgment motion, despite their failure to renew their motion for a directed verdict at the close of all the evidence.

■ Professor Moore's treatise observes that a postjudgment motion as a general rule may be made even when the moving party has failed to renew a directed verdict motion at the close of all the evidence provided two criteria are met: the trial court indicates it is not necessary to move in order to preserve the right, *and* the nonmoving party's evidence following the unrenewed motion was "brief and inconsequential." *See* 5A J. Moore & J. Lucas, *Moore's Federal Practice* ¶ 50.08 (2d ed. 1987). In *Ebker v. Tan Jay Int'l, Ltd.,* 739 F.2d 812 (2d Cir.1984), we adopted Professor Moore's first criterion, but reformulated his second one. Instead of evaluating whether evidence subsequent to the unrenewed motion was "brief and inconsequential," the trial court should determine whether the nonmoving party could reasonably believe it was safe to rest on its oars. Or, as we put it in *Ebker,* whether the party having notice of a motion directed against the sufficiency of its proof could reasonably believe in light of the proof following the unrenewed motion that it need do nothing further to be free from the risk of judgment n.o.v. *Id.* at 823–24; *see Best Brands Beverage, Inc. v. Falstaff Brewing Corp.,* 842 F.2d 578, 587 n. 3 (2d Cir.1987). Although in *Ebker* the nonmoving party did not object to the district court's entertaining the postverdict motion, while here counsel for American Protein vigorously disputed the propriety of the trial court's entertaining defendants' post-

verdict judgment n.o.v. motion, we believe *Ebker*'s approach appropriate. Since the grounds of the motion were the same as those spelled out in the unrenewed motion for a directed verdict, plaintiff is not prejudiced here by defendants' failure to renew at the close of all the evidence. *Ebker,* 739 F.2d at 824.

Drawing from the trial court's comments, it is plain that the first criterion was met. The *Ebker* approach is particularly appropriate here since the motion for a directed verdict at the end of the plaintiff's case was not denied until the end of all the evidence. It would be a pointless formality to require a defendant at that point to renew the motion. We think the second criteria as amended by *Ebker* has also been satisfied. American Protein had notice after it rested that defendants believed its proof on the tortious interference count deficient. Detailed arguments on appellants' motion at the close of plaintiff's case were entertained and decision was reserved by the trial court. Defendants' evidence in no way strengthened plaintiff's case. More importantly, American Protein claimed neither that it would have nor that it could have presented any additional evidence to compensate for deficiencies in its proof. As a consequence, defendants' right to make a postjudgment motion was preserved.

### B. *Merits of Jurisdiction/Tortious Interference*

1. *Jurisdiction:* Having hurdled the procedural obstacle, we now turn to the substance of the jurisdiction/tortious interference issue. We consider jurisdiction first. Jurisdiction over Volvo must be established by American Protein by a preponderance of the evidence. In this diversity case New York provides the applicable law. *Arrowsmith v. United Press Int'l,* 320 F.2d 219, 223 (2d Cir.1963) (en banc). Jurisdiction apparently was based on N.Y.Civ. Prac. L. & R. 302(a)(2) (McKinney 1972), which provides that a New York court may exercise jurisdiction over any nondomiciliary who in person or through an agent "commits a tortious act within the state." The jury found that Volvo committed a tortious act within New York when its two executives attended the October Beijer, Inc. Board of Directors meeting in New York City and at that meeting ordered its subsidiary to "wind down" its affairs. Beijer, Inc. then breached the contract with plaintiff, allegedly with Volvo's approval, constituting a tortious interference by Volvo and Lastvagnar with performance of Beijer, Inc.'s contract with American Protein. Jurisdiction is thus intertwined with the merits of Volvo's liability. *See United States v. Montreal Trust Co.,* 358 F.2d 239, 242 (2d Cir.), *cert. denied,* 384 U.S. 919, 86 S.Ct. 1366, 16 L.Ed.2d 440 (1966). Volvo argues that its executives who were also Beijer, Inc. directors were merely performing their duties as corporate fiduciaries and that their actions were justified under New York law.

These contentions frame two issues: (1) did the decision of the Volvo executives to "wind down" the affairs of Beijer, Inc. constitute tortious interference with American Protein's contract, and (2) if so, are the actions of these executives attributable to Volvo or did they act solely in their capacities as directors of Beijer, Inc.? Since, as will appear, we conclude that no tortious interference occurred, we need not consider the somewhat metaphysical question of whether a person serving as director of both a subsidiary and a parent corporation can subject the parent to liability by voting at a meeting of the subsidiary's board.

■ 2. *Tortious Interference:* Turning to the merits of the tortious interference claim, we must apply New York conflicts law in this diversity action, *see Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 1021–22, 85 L.Ed. 1477 (1941), which holds that the law of the forum with the most paramount interest in the application of its law should be selected, *see Knieriemen v. Bache Halsey Stuart Shields Inc.,* 74 A.D.2d 290, 293, 427 N.Y.S.2d 10 (1st Dep't), *appeal dismissed,* 50 N.Y.2d 1021, 431 N.Y.S.2d 812, 410 N.E.2d 745 (1980). This forum clearly is New York, as the acts constituting the alleged tort occurred in New York and a New York corporation (Beijer, Inc.) was

implicated. Accordingly, the trial court properly applied New York law to the tortious interference claim.

The law of New York provides an applicable rule when a possible conflict arises between a director's duty to honor corporate contractual obligations and simultaneously to protect the stockholders' best interests. In such an event, directors of parent companies are released from liability for the contract's dishonor when it results from an effort to protect stockholders, absent a malicious motive. *Felsen v. Sol Cafe Mfg. Corp.*, 24 N.Y.2d 682, 686, 301 N.Y.S.2d 610, 249 N.E.2d 459 (1969). In *Felsen* the New York Court of Appeals—reversing a judgment on a claim similar to the instant one—explained that the plaintiff could not recover unless it established that the defendant's actions were "motivated by malice toward the plaintiff rather than by the preservation of its own economic interest...." *Id.* at 686–87, 301 N.Y.S.2d 610, 249 N.E.2d 459. In adopting that proposition, the court continued, an individual with an economic stake in the business of another may interfere with a contract that the other business has with a third person if the purpose is to protect the individual's own stake. In other words, terminating a corporate contract in furtherance of an equally important right to act in its own economic interests justifies what would otherwise be actionable. *Id.* at 687, 301 N.Y.S.2d 610, 249 N.E.2d 459.

■ There is no evidence on the record before us of malice toward American Protein on the part of either Volvo or Lastvagnar. Plaintiff failed to establish a *prima facie* case of tortious interference with contractual relations because the evidence showed only that Volvo executives on the board of Beijer, Inc. endorsed terminating Beijer, Inc.'s contract with plaintiff for the legitimate business reason that it was losing money. Consequently, the verdicts against Volvo and Lastvagnar for tortious interference with a contractual relationship under Count V of plaintiff's complaint must fail as a matter of law. Those verdicts are reversed.

## IV

We consider finally Counts VI and VII of the complaint, which charged Lycke with fraud and negligent misrepresentation. The jury exonerated Lycke of fraud, but awarded American Protein $200,000 for negligent misrepresentation.

Here the alleged misrepresentations submitted for the jury's assessment by the trial court—unfortunately not in interrogatory form—were as follows:

(1) Beijer, Inc. was a division of a world-wide network of companies operated by Beijerinvest and that Beijerinvest funded the projects undertaken by these companies;

(2) Beijerinvest intended to fund the project and to insure Beijer, Inc. satisfied its obligations under the blood products contract;

(3) Beijer, Inc. had wide experience in marketing food products;

(4) Beijer, Inc. would be able to market all of American Protein's projected output under the blood products contract for three years; and

(5) Beijerinvest's other food companies in Sweden could alone absorb one-third of American Protein's projected output under the blood products contract.

■ Under New York conflicts law, a court must apply the substantive tort law of the state having the most significant relationship with the occurrence and with the parties. *Babcock v. Jackson*, 12 N.Y.2d 473, 482, 240 N.Y.S.2d 743, 191 N.E.2d 279 (1963); *see Machleder v. Diaz*, 801 F.2d 46, 51 (2d Cir.1986), *cert. denied*, —— U.S. ——, 107 S.Ct. 1294, 94 L.Ed.2d 150 (1987). Given that Lycke is president of a New York corporation and that many of the alleged misrepresentations originated in New York, we conclude that New York law applies. The law of negligent misrepresentation, as enunciated in New York, recognizes that "generally there is no liability for words negligently spoken" but that "there is an exception when the parties' relationship suggests a closer degree of trust and reliance than that of the ordinary buyer and seller." *Coolite Corp.*

**64**

v. *American Cyanamid Co.*, 52 A.D.2d 486, 384 N.Y.S.2d 808, 811 (1st Dep't 1976). The speaker must be "bound by some relation of duty, arising out of contract or otherwise." *White v. Guarente*, 43 N.Y.2d 356, 363, 401 N.Y.S.2d 474, 478, 372 N.E.2d 315, 319 (1977). *See Mallis v. Bankers Trust Co.*, 615 F.2d 68, 81–82 (2d Cir.1980), *cert. denied*, 449 U.S. 1123, 101 S.Ct. 938, 67 L.Ed.2d 109 (1981). If in the course of contract negotiations an employee of one party makes a fraudulent misrepresentation, of course a fraud claim is available, but here the jury rejected APC's fraud claim. In the absence of fraud and in the absence of a special relationship giving rise to a duty, it is up to the party hearing words he deems important to make them part of the contract.

Even assuming that the statements set out above were negligently spoken, no cause of action exists under the facts of the instant case. APC fails to allege that there was a special relationship between it and Beijer, Inc. before the contract was signed. Rather, APC took the risk that all contracting parties face: that the other party to the contract might end up in bankruptcy. Since APC alleges nothing more than ordinary arm's length negotiations, its negligent misrepresentation claim fails as a matter of law. Accordingly, the jury award on Count VII of the complaint must be reversed.

Finally, our resolution of the counts above obviates the need for addressing appellants' argument that the jury's overall damage award was inconsistent.

## CONCLUSION

In sum, the verdict against Lastvagnar on Count I on a theory of piercing the corporate veil, and on Counts II and III is reversed. The verdict against Volvo and Lastvagnar for tortious interference with plaintiff's contract with Beijer, Inc. under Count V is reversed. The verdict against Lycke for negligent misrepresentation under Count VII is also reversed.

Judgment reversed.