**CARTE BLANCHE (SINGAPORE) PTE., LTD., Plaintiff,**

v.

**DINERS CLUB INTERNATIONAL, INC. a/k/a Citicorp/Diners Club, Inc., a/k/a the Diners Club, Inc., and Carte Blanche International, Ltd., Defendants.**

**No. 88 Civ. 2719 (WK).**

United States District Court, S.D. New York.

Sept. 4, 1992.

Sheldon H. Elsen, Lawrence M. Solan, Melissa A. Cohen, Orans, Elsen & Lupert, New York City, for plaintiff.

Steven J. Stein, Linda S. Gordy, Proskauer Rose Goetz & Mendelsohn, New York City, for defendant Diners Club Intern., Inc.

Michelena Hallie, Kay Collyer & Boose, New York City, for defendant Carte Blanche Intern. Ltd.

## OPINION AND ORDER

WHITMAN KNAPP, Senior District Judge.

By this complaint, plaintiff seeks to compel defendant Diners Club International, Inc. ("Diners"), the corporate parent of defendant Carte Blanche International, Ltd. ("CBI"), to satisfy a judgment which it obtained against CBI in 1991. By Opinion and Order dated March 5, 1991 Judge Leisure decided the parties cross-motions for summary judgment and narrowed the issues for trial. Judge Leisure then referred this action to us, and during the period November 12th through the 18th, we presided over a 4 day bench trial. At the close of those proceedings we suggested that the parties submit post-trial memoranda. Having reviewed such memoranda, we now, pursuant to Fed.R.Civ.P. 52, set forth our findings of fact and conclusions of law. We find that plaintiff has not met its burden of proof, and judgment for defendant must be entered accordingly.

## BACKGROUND

We first set forth a brief recitation of the facts necessary to understand the nature of the instant dispute. We then outline the

questions Judge Leisure determined must be decided by the trier of fact, and finally we review the evidence presented at trial that we find to be dispositive of these questions.

From its inception in 1972, CBI was a wholly owned subsidiary of an entity known as Carte Blanche Corporation ("Carte Blanche"), which in turn was a wholly owned subsidiary of Citicorp. In June 1981 Citicorp acquired defendant Diners, and approximately one year later Carte Blanche was merged into Diners. It is undisputed that, as corporate successor, Diners assumed Carte Blanche's obligations.

At all relevant times, Carte Blanche was engaged in the business of issuing credit cards in the United States and was the owner of the registered trademark "Carte Blanche". Its subsidiary CBI acted as the international franchisor for Carte Blanche credit cards, granting foreign franchisees the right to issue such cards in certain territories outside the United States, and administering their use of such right. During the period 1972 through 1980 CBI awarded approximately seven international franchises, one of which to plaintiff, a Singapore corporation. The Franchise Agreement executed by CBI and plaintiff provided that plaintiff would become a franchisee of CBI to market and service Carte Blanche credit cards in Malaysia, Singapore and Brunei. This Agreement was executed on August 11, 1980, and by its terms was retroactive to March 1, 1980.

At the time CBI executed that Franchise Agreement, it had approximately ten employees and maintained its offices and financial records separate from those of its parent, Carte Blanche. CBI's income was derived from the one-time franchise fees which it received when it signed up a new franchise and subsequent royalties received from its franchisees. It also received financing in the form of inter-company loans from Carte Blanche, and the maximum amount outstanding on such loans, as reflected on its December 31, 1981 balance sheet, was at least $7,623,118.

During the summer of 1980 one Pei Chia was appointed President of Carte Blanche (Tr. 491). In reviewing its financial condition, Chia determined that it was poor and directed that all new spending, including investment in CBI, be put on hold pending further review (Tr. 493, 494–5, 540). In August Chia conveyed this information to Marcel Diraison, the Chief Executive Officer of CBI. In response, Diraison informed Chia that the agreement with plaintiff was "a done deal" (Tr. 536).

In December Chia concluded that the only financially sound solution to the problems confronting Carte Blanche was to wind down its business, and conveyed this information to Citibank (Tr. 506). Citibank concurred in this assessment and directed Chia to commence a wind down of all businesses connected to Carte Blanche credit cards, which included CBI.

In June of 1981, approximately six months after this mandate to wind-down the Carte Blanche business was issued, one Seymour Flug, who was then the Chairman of a subsidiary of Diners, was appointed Chairman and subsequently President of CBI[1] (Tr. 121). Under the direction of Flug, during the next few months CBI negotiated termination agreements with all of its franchisees, except plaintiff. In September 1981, Flug met with plaintiff's representatives, its president Tan Kim Wah and one Teik Kim Lau, and offered them a termination agreement, the terms of which would provide that CBI would reimburse plaintiff its $100,000 franchise fee, its past losses, and its anticipated wind down expenses, in exchange for the termination of the Franchise Agreement. Plaintiff initially accepted this proposal and the total figure agreed upon was $625,000. However, the next day, when the parties met to execute the agreement, plaintiff informed Flug that it would like to include in the written contract a provision that in the

---

**1.** Flug had been involved in the international franchise business of Diners for over 10 years prior to this appointment, and was Chairman of the division known as Diners Club International-

al. Although Diner's was acquired by Citicorp in June 1981, the merger of Diner's and Carte Blanche was not completed until on or about September 1982.

event Carte Blanche determined to use the Carte Blanche trademark in international territories in the future, plaintiff would be given a right of first refusal with respect to the right to use the mark (Tr. 184). Flug rejected this demand, and plaintiff then refused to accept the termination agreement.

Shortly after the above-described meeting, plaintiff wrote a letter to John W. Heilshorn, the Executive Vice–President of Citibank, concerning its meeting with Flug. In this letter, plaintiff stated that it understood that "Carte Blanche has no definite plans in their world operation in the near future and wishes to terminate all international Franchises", but that plaintiff "prefer[s] to live and die with Carte Blanche". This letter was referred by Citibank to Flug. Flug testified that he perceived this letter as an attempt to do an "end run" around him, and he responded to it by advising plaintiff to reconsider accepting the recision agreement which had been proposed before plaintiff suggested the right of first refusal. Plaintiff declined so to do. In November 1981 plaintiff and CBI did mutually agree, however, to modify the Franchise Agreement to reflect the fact that in light of the decision to wind-down the Carte Blanche business worldwide, plaintiff was now offering its customers an essentially local card[2].

CBI continued to wind down its operations, and by 1984 its only remaining business was to service plaintiff's franchise. By then, CBI's assets had diminished to zero, it had no offices of its own, it did not keep separate financial records, and its only remaining employee was Flug, who, as previously noted, was also an officer of another subdivision of the parent company, which was now Diners[3]. Flug testified that the services that were being delivered to plaintiff during this period consisted primarily of the clerical task of occasionally supplying it with plastic credit cards and forms. To keep down expenses these tasks were performed by two Diners personnel (Tr. 303, 309, 332).

In December 1984 a finance company known as MBf acquired a 50% interest in plaintiff and took control of its business. When CBI learned of this acquisition, Flug informed plaintiff that he believed this transfer of ownership, without CBI's consent, violated certain provisions of the Franchise Agreement and he placed plaintiff under formal notice of default. Thereafter Flug met with counsel for plaintiff to inquire whether or not MBf had been informed of CBI's wind down status. At this meeting very little substantive information was exchanged and Flug requested that a meeting with plaintiff's principals be arranged, which meeting was ultimately scheduled for April 15.

Three events had occurred prior to the April 15 meeting. First, on or about March 1 the Franchise Agreement between plaintiff and CBI had been renewed. Second, on March 12 plaintiff notified CBI that it would like to be assigned 14–digit account numbers for its cards, a service which would permit plaintiff to gain access to a CAT system or computer authorization terminal which would speed up credit authorization for its cardmembers. Upon receipt of this request, Flug directed the personnel handling services to plaintiff to put on hold this, and any other "new" request[4]. Third, on or about April 10, plaintiff forwarded to CBI a book, which plaintiff characterized as an "Agenda", listing numerous additional operational demands and complaints which it would like to discuss at the April 15 meeting. This book included such requests as worldwide advertising for plain-

---

**2.** The modified franchise agreement relieved plaintiff of certain minimum cardmember and merchant requirements in view of the difficulties plaintiff would be likely to face when its card became less accepted outside of its territory due to the diminution of the Carte Blanche businesses.

**3.** CBI's 1983 financial records—which were kept separate from Diners—reflect that the tax bene-

fit which it accrued from its business losses during this period was applied as a reduction in its intercompany debt, and was not used by Carte Blanche for its own benefit. *See* Tr. 837.

**4.** *CBI continued, however, to provide plaintiff with the services which had been provided it in the past, namely supplying cards and forms, etc.*

tiff's card and international warning bulletins concerning lost or stolen cards, as well as other services which had been made available to the remaining Carte Blanche cardholders in the United States in the period after the 1982 merger of Carte Blanche and Diners.

On April 15, Flug met with plaintiff's principals, who now consisted of Dato Loy, the Chief Executive Officer of MBf, and Khoo Soo Peng, plaintiff's chief general manager who was also an MBf employee. Neither Tan Kim Wah nor Teik Kim Lau, the persons Flug had previously dealt with as plaintiff's representatives, attended. At the meeting Flug took the position that CBI was not willing to discuss plaintiff's operational requests until the issue concerning the propriety of the transfer of plaintiff's shares to MBf was cleared up. The meeting terminated abruptly without any matters of substance being discussed.

Thereafter both parties filed demands for arbitration. As previously stated, defendant claimed that the acquisition of plaintiff by MBf constituted a breach of the Franchise Agreement, and plaintiff countered that CBI had breached the agreement by reducing essential services. On October 5, 1985 the matter was admitted to arbitration, and by Interim Award dated February 18, 1987, the arbitrators found for plaintiff on both claims. More particularly, the arbitrators concluded that CBI had breached the Franchise Agreement on April 15, 1985 and ordered it to pay plaintiff $8,993,638.20, plus interest, in damages. This award was confirmed, except for the rate of interest on post-judgment amounts due, by order of this Court dated April 8, 1988. *See Carte Blanche (Singapore) PTE, Ltd. v. Carte Blanche Int'l, Ltd.* (S.D.N.Y.1988 (PKL)) 683 F.Supp. 945, *aff'd,* (2d Cir.1989) 888 F.2d 260.

On April 19, 1988, plaintiff commenced this action. As previously stated, on March 5, 1991 Judge Leisure issued his opinion granting in part and denying in part the parties' cross-motions for summary judgment. *See Carte Blanche (Singapore) PTE., Ltd., v. Diner's Club International, Inc., et ano.* (S.D.N.Y.1991) 758 F.Supp. 908.

In relevant part, Judge Leisure made the following findings. First, he found that New York law governs the instant dispute. Second, he determined that "the preclusive effect of the arbitration goes no farther than what the panel necessarily found, that CBI breached the Agreement, that ... [plaintiff] did not, and the amount of damages resulting from CBI's breach". *Id.* at 913. In so holding, Judge Leisure expressly noted that any statements by the arbitrators to the effect that CBI and Diner's/Carte Blanche operated as a single integrated business had no binding effect, as they were clearly not essential to the issues they had decided.[5]

With respect to the question of whether or not plaintiff could prevail, as a matter of law, on its claim that the corporate veil should be pierced in the instant circumstances and that Diner's should be held liable for the judgment rendered against CBI, Judge Leisure ruled that genuine issues of material fact existed for determination by the trier of fact. *Id.* at 914. In so ruling, he expressly narrowed the issues for trial in the following manner. First, he held that regardless of whether plaintiff proceeded upon an alter-ego theory of veil piercing or upon the theory set forth in *Lowendahl v. Baltimore & O.R.R.* (1st Dept.1935) 247 A.D. 144, 287 N.Y.S. 62, *aff'd,* 272 N.Y. 360, 6 N.E.2d 56 (1936), questions of fact existed as to the extent to which Carte Blanche was exercising dominion and control over CBI's actions at the time of the breach of contract. *Id.* at 914, 919. Second, with respect to plaintiff's burden of proof under *Lowendahl,* he observed that plaintiff must demonstrate:

(1) control amounting to complete domination with respect to the transaction attacked; (2) use of such control to

5. On August 21, 1991 Judge Leisure issued a second opinion denying the parties' cross-motions for reargument of their cross-motions for summary judgment. In that opinion, Judge Leisure again expressly rejected the plaintiff's contention that statements made by the arbitrators concerning the integration between CBI and Diners could here have a binding effect.

perpetrate a fraud or wrong, including a violation of a positive legal duty; and (3) the control and breach of duty must proximately cause the injury complained of. *See Gorrill v. Icelandair/Flugleidir* (2d Cir.1985) 761 F.2d 847, 853 (construing New York law).

*Id.* at 914. He also found that plaintiff's proof with respect to the second prong, "a fraud or wrong", would be limited to evidence establishing either (a) asset-stripping or (b) breach of contract[6]. With respect to (a), he determined that plaintiff must prove both that Diners stripped the assets of CBI and that it did so with the intent to render the subsidiary judgment proof. With respect to (b), he specified that plaintiff need not demonstrate that the breach of contract occurred, as that fact was conclusively established by the arbitrators, but must demonstrate that Diners caused CBI to breach the contract or rather that Diners "used its control to cause the breach of contract". *See id.* at 917–18. Relatedly, he held that if plaintiff should attempt to establish asset stripping as the second prong, a question of fact would exist as to whether or not this wrong proximately caused the damages of which plaintiff complains. On the other hand, if plaintiff should prove that Diners caused the breach of contract by CBI, the arbitrators' determination that such breach was the proximate cause of plaintiff's damages would here be binding. *Id.* at 918.

### Evidence at Trial

The testimony of Seymour Flug, whom plaintiff called as part of its case in chief, occupied approximately two of the four days of trial (Tr. 114–488)[7]. Flug recalled that when he was first appointed as chairman of CBI in 1981, the decision to wind down the company had already been made, and he was instructed that the manner in which to implement this decision was left to his discretion (Tr. 153). With respect to the 1981 failed negotiations between plaintiff and CBI to execute a termination agreement, Flug testified that his reason for not conceding to plaintiff's demand for a right of first refusal was that he "didn't think it was fair or possible to give it to them". More specifically, he stated (Tr. at 187):

I told them in my own mind that when you set out to wind down an operation like I was doing, it just doesn't seem proper or make much sense to be issuing rights at a time when you are winding down an operation.

As far as I knew at the time, there were no plans anywhere in Carte Blanche to do anything with the card. I had nothing up my sleeve. But when I turned them down, they suspected that I had this grandiose plan, and they backed off the whole deal at that time.

Immediately after making this statement, and before reviewing any documents offered to refresh his recollection of these events, Flug added (Tr. at 189):

[O]ne other thing that comes to mind. My sense at the time was that this request, which, by the way no other franchise had asked for, and I had previously been involved in the wind-down of a franchise operation significantly larger than this and no one ever requested that—I really felt that this was sort of a negotiating technique on their part, that it would ratchet the deal up to another level and then we would start with that. So also that was in my mind.

Plaintiff then offered the following portions of Flug's testimony at the 1985 arbitration proceedings which were received into evidence without objection (Tr. 190–195):

FLUG: If I thought at the time that they were serious and that it wasn't a negotiating technique—you know, hindsight is wonderful ... I didn't offer them money, I agreed to give them what they [had] asked for. I think .... [their] sense at the time was that I had a grand plan and eventually I would have to come back with a lot more money, and this was an opportunity to make a lot more money.

---

6. In so ruling, Judge Leisure expressly granted summary judgment for Diners on plaintiff's claim of fraudulent misrepresentation.

7. The complete trial transcript consists of 880 pages.

QUESTION: But inasmuch as you had no such grand plan and were causing it all down, why not give them the right of first refusal?

FLUG: Because I have a name, called Carte Blanche, and I don't know what I may want to do with it one day, and I can't let an operation in Singapore or anywhere else in a particular country in the world govern or restrict what I may want to do some day on a grand scale basis ... If I had a plan in place that I wanted to start up a Carte Blanche operation the next day, the next week you better believe they would have been out of there at any price. But with the understanding in my mind that we had no plans whatsoever with Carte Blanche, let them lay.

    \*     \*     \*     \*     \*     \*

I made a decision at that time that the passage of time would prove to them that I didn't have anything up my sleeve.

When subsequently asked at trial whether or not CBI's reason for continuing to service plaintiff, as the lone franchisee, in the period post September 1981 was motivated by a desire to maintain quality control over the Carte Blanche mark to avoid a claim of abandonment of the mark, Flug responded (Tr. 263):

CBI continued to service the company to keep the contract in effect because it was my instructions to cause an orderly wind down, and it was left up to me on how to accomplish that.

He then clarified this statement by adding that he could not recall—one way or the other—if the decision to continue to service plaintiff was also motivated in part by a desire to protect the mark (Tr. 263). On cross-examination, he further stated that he was not familiar with the doctrine that a trademark might be abandoned by the failure to exercise quality control (Tr. 468).

With respect to the circumstances surrounding the actions which the arbitrators had determined constituted a breach of the Franchise Agreement by CBI, Flug testified that he could have offered plaintiff certain services, such as the 14–digit codes and warning bulletins "with minor assis-

tance" from Diners (Tr. 341). However, he explained that the reason he chose not to offer such services was that (Tr. 304):

I, they asked me to deliver those services to them in the midst of the period of time when they were perceived by me to be in breach of contract, and until I knew what was going on, I told my people, don't do anything new for them, new. These were all new services they wanted. All the other services that were being performed continued to be performed.

To contradict this statement, and in support of its claim that CBI breached the Franchise Agreement to further the interests of the parent, Diners, plaintiff produced a memorandum dated April 27, 1985 which was written by Flug to one Thomas Barnum, an executive of Citicorp. In this memorandum, Flug reported that plaintiff remained the only Carte Blanche operation outside of the United States. The document then continued (PX 91):

I don't know how close we are to reactivating Carte Blanche either as a co/branded card or in some other form. However, it would be critical from both a business and legal standpoint that prior to such reintroduction we get rid of the present [plaintiff].

In explaining this memorandum, Flug testified that at the time of the April 15 meeting—when he refused to provide plaintiff with the services it had requested—he did not know of any plans to re-activate the Carte Blanche business. He stated that the memo was the result of a conversation he had after that meeting, and that it was intended to inform Diners that anything it might now do with the Carte Blanche mark could foul up CBI's negotiations with—and a possible lawsuit by—the plaintiff. In relevant part, Flug's testimony on this matter was as follows (Tr. 395):

The day I wrote that memorandum and the reason I wrote the memorandum was because I heard from Mr. Thomas, who was executive vice-president of DCI, Diners Club International, that he had heard that there are plans under way, something was going on with Carte Blanche.

He mentioned something about a program with a mid-west oil company, something like that, and I said, did you hear anything else. And he said, no. I, having just come 12 days before from a terrible meeting with the MBf people, the new franchisee, having received a letter several days later from their chairman making all kinds of demands and threatening legal action, when he told me that he heard that the may be doing something with Carte Blanche, 'cause I was in New York and he was in Chicago with the Carte Blanche people, I called Barnum. He wasn't in. I wrote him a memo....

And the reason I wrote him the memo was to tell him that, if you are going to do anything with Carte Blanche, my God, don't do it now, because I've got people who have been posturing for a lawsuit now for the last several years and we just had a terrible meeting and we just had a terrible letter threatening all kind of litigation. So, my God, you know, if you're going to do anything with it, this is really a lousy time to do it.

The only other witness produced by plaintiff who had direct knowledge of the meetings which had occurred between it and CBI was Mr. Khoo. Mr. Khoo, who first joined MBf in August 1984 and was appointed general manager for plaintiff in December 1984, attended the April 15, 1985 meeting. Over defendant's objections, written notes which Mr. Khoo had taken concerning what had occurred at that meeting, and which he stated he had transcribed "about ten days to two weeks" thereafter, were admitted into evidence. (Tr. 599; *see* Pl.Exhs. 97, 98).

Relying on those notes, Khoo testified that he had a very strong recollection that Flug had informed plaintiff at the meeting that CBI would honor its obligations under the Franchise Agreement (Tr. 602). In response to the question of whether or not Flug had informed Dato Loy that CBI was finished and had suggested that perhaps MBf had not been fully apprised of this fact before it decided to assume control of plaintiff, Khoo testified that he could not recall such statements being made at that time. However, when directed to review his notes, he admitted that these statements must have been made, as his notes so reflected (Tr. 611–12).

## DISCUSSION

■ There can be no doubt that in the circumstances at hand the parent, initially Carte Blanche, then Diners, had the power of total control over the subsidiary CBI. CBI's financial existence from the date of its inception in 1972 through the date it breached the Franchise Agreement and thereafter, was largely dependent on money loaned it by the parent; its chairman Flug was also an officer of another subdivision of the parent; and by 1984 it had no books, offices, or employees separate from those of the parent. However, as observed in Judge Leisure's March 1991 opinion, it is well settled under New York law that the parent's mere *power* to control the subsidiary is not enough to pierce the corporate veil. *Carte–Blanche*, 758 F.Supp. at 914–918; *see Passalacqua Builders, Inc. v. Resnick Developers South, Inc.* (2d Cir. 1991) 933 F.2d 131, 137–139; *American Protein Corp. v. AB Volvo* (2d Cir.1988) 844 F.2d 56, 60; *Gorrill v. Icelandair/Flugleidir* (2d Cir.1985) 761 F.2d 847, 853. If it were enough, veil piercing would occur in each and every case involving a wholly owned subsidiary.

■ The most recent statement of this Circuit as to what is required under New York law to pierce the corporate veil is *Passalacqua*, which was decided after Judge Leisure's March 1991 decision. We note at the outset that the Court there held that the trial court had improperly taken the question from the jury. In the instant case Judge Leisure has done precisely what Judge Pollack was criticized for not doing, namely submitting the question to a finder of fact.

Acting as such finder, we deem the following considerations to be significant. First, plaintiff does not suggest that CBI was not originally established for a proper corporate purpose. Second, there is no suggestion that any assets of CBI were "switched around" and improperly put to the use of the parent or any other subsidiary. Third, we find that there is no evi-

dence that any assets were improperly taken from CBI by Diners; all CBI assets which were transferred to the parent were in repayment of a perfectly lawful outstanding corporate debt. Fourth, originally, and until the declining profitability of the enterprise made it impracticable, CBI functioned with its own personnel and separate office space. This last situation began to change when the parent determined that it made no sense to continue to support the subsidiary, and instructed Flug to wind down CBI's business. It seems to us to follow that Flug's conduct is the crux of this case, and therefore that his credibility—or lack thereof—in explaining such conduct is critical to our decision. *See Passalacqua,* 933 F.2d at 138; *American Protein,* 844 F.2d at 60; *Carte–Blanche,* 758 F.Supp. at 915, 918–19.

As noted above, Flug testified that at the time he decided not to provide plaintiff with the services it had requested, he believed plaintiff was itself in breach of the Franchise Agreement. He further stated that at the time of the April 15, 1985 meeting he had determined—and told plaintiff—that CBI would continue to meet its obligations under the Franchise Agreement, but that he did not believe these obligations included providing plaintiff with the "new" services it had requested in late 1984.

We found Flug to be a very credible witness and his testimony in this regard to be very persuasive. To be sure, he was wrong in his belief that plaintiff had breached the Franchise Agreement prior to April 15; but we are confident that this is what he then thought and that this belief motivated his actions. Similarly, despite the fact that the arbitrators later determined that CBI's refusal to provide plaintiff with the services which it had requested constituted a breach of the Franchise Agreement, we are confident that Flug did not at the time believe CBI's actions in this regard to be wrongful.

On the basis of this evidence, we are persuaded that Flug's decision that CBI would not provide plaintiff with the services it had requested was the result of his personal belief that plaintiff had breached the Franchise Agreement and his belief that CBI was not obligated to provide plaintiff with these services. We are also persuaded that Flug's negotiating tactics in 1981 (i.e. his failure to yield to plaintiff's demand for a right of first refusal in connection with the proposed termination agreement) were based on his belief that plaintiff's making of this demand was part of a negotiation tactic, and that any yielding on his part would only result in a higher price that CBI would ultimately have to pay for a termination agreement. In brief, we find that Flug's entire conduct in his dealings with plaintiff were consistent with his obligation as an officer of CBI to protect its own corporate interests. That such efforts also benefitted CBI's parent was an inevitable consequence of the relation between every subsidiary and its parent.

### CONCLUSION

Accordingly, on the basis of the evidence produced, we can not conclude that the corporate veil should be pierced. We therefore find in favor of defendants and direct the clerk to enter judgment accordingly.

SO ORDERED.