Chey BACKUSWALCOTT, Plaintiff,

v.

COMMON GROUND COMMUNITY HDFC, INC., Defendant.

Garry Rissman, Plaintiff,

v.

Common Ground Community HDFC, Inc., Defendant.

No. 99 CIV. 1759 (WK).

United States District Court, S.D. New York.

July 24, 2000.

Edward Land, New York City, for Plaintiff.

Candace Carponter, New York City, for Defendant.

### OPINION & ORDER

KNAPP, Senior District Judge.

These two related cases accuse defendant Common Ground Community HDFC, Inc. (hereinafter "defendant") of violating the Fair Debt Collection Practices Act (the "FDCPA" or "the Act" or "the statute"), 15 U.S.C. § 1692 *et seq.*, in its efforts to collect rent arrears from plaintiffs Chey Backuswalcott and Gary Rissman, who live at the Times Square Hotel (the "Hotel"). Plaintiffs move for partial summary judgment (statutory damages of $1000 each and attorney's fees), and defendant cross-moves for summary judgment. For the reasons stated below, we grant summary judgment to defendant and dismiss both cases because defendant fits within an exemption to the statute.

### BACKGROUND

Defendant, a not-for-profit corporation, was established for the stated mission of finding creative solutions to the problem of homelessness. It obtained funding to renovate the Hotel and to provide and monitor social services therein. We more fully describe defendant's functions below.

Defendant set up the following corporate structure: The Times Square Hotel is owned by "T.S. Hotel, L.P.," a New York limited partnership. "Times Square G.P. Corp." is the general partner of that limited partnership and a 1% owner thereof.

Defendant is the sole shareholder of the general partner and is also the "managing agent" of the Hotel. Defendant claims that it used this complicated structure because, in order to obtain subsidies and tax credits, it had to transfer the premises to a "for-profit" entity. Plaintiffs unconvincingly question this rationale. In any event, plaintiffs cannot seriously deny that the corporate formalities are maintained.

In March 1998, plaintiff Backuswalcott received a rent demand giving her only five days to pay. The five-day demand was signed by one Mark Kerr, who is identified as the "Rent Administrator" of T.S. Hotel L.P. Similarly, in February 1999, plaintiff Rissman received a five-day demand signed by one Vikia Johnson, identifying herself as Kerr had done.

## DISCUSSION

■ When adversaries make cross-motions for summary judgment, the court must evaluate each party's motion independently "on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Heublein, Inc. v. United States* (2d Cir.1993) 996 F.2d 1455, 1461 (citation omitted). Since we grant summary judgment to defendant, we have construed the facts in the light most favorable to plaintiffs.

■ The Second Circuit has held that "back rent is a debt" within the meaning of the FDCPA, and thus that a demand for back rent may be a communication from a "debt collector." *Romea v. Heiberger & Assocs.* (2d Cir.1998) 163 F.3d 111, 115–16. Defendant concedes that the rent demands at issue in the instant cases do not meet all of the statute's requirements for a legal debt collection notice.

■ Congress enacted the FDCPA "to protect consumers from a host of unfair, harassing, and deceptive debt collection practices without imposing unnecessary restrictions on ethical debt collectors." S.Rep. No. 95–382 (1977), *reprinted in* 1977 U.S.C.C.A.N. 1695, 1696. Crucially, the legislators believed that third-party debt collectors commit most of the abuses:

> Unlike creditors, who generally are restrained by the desire to protect their good will when collecting past due accounts, independent collectors are likely to have no future contact with the consumer and often are unconcerned with the consumer's opinion of them. Collection agencies generally operate on a 50–percent commission, and this has too often created the incentive to collect by any means.

*Id.*

Therefore, the statute does not apply to creditors collecting their own debts. It also contains the following so-called "affiliate exemption." The Act's definition of "debt collector" explicitly excludes:

> any person while acting as a debt collector for another person, both of whom are related by common ownership or affiliated by corporate control, if the person acting as debt collector does so only for persons to whom it is so related or affiliated and if the principal business of such person[1] is not the collection of debts.

15 U.S.C. § 1692a(6)(B) (hereinafter " § 6(B)").

Defendant meets all three requirements of this exemption, and thus it need not abide by the statute:

## (1) Related by Common Ownership or Affiliated by Corporate Control

■ The Act is normally construed broadly to protect tenants. *Harrison v. NBD Inc.* (E.D.N.Y.1997) 968 F.Supp. 837,

---

1. Although admittedly the Act is not a model of "drafting clarity," *Kimber v. Federal Fin. Corp.* (M.D.Ala.1987) 668 F.Supp. 1480, 1484, the phrase "such person" in this context surely refers to the "person acting as debt collector" (and not to the creditor). *See Byes v. Edison Bros. Stores, Inc.* (E.D.La. May 24, 1995) No. 94 Civ. 3100, 1995 WL 1131422.

844. But, given Congress' express exemption, courts have interpreted this "common ownership" language broadly. *Taylor v. Rollins, Inc.* (N.D.Ill. Mar. 30, 1998) No. 97 C 4156, 1998 WL 164890, *4 (citing cases).

In our case, defendant owns all of the shares of the general partner of the limited partnership that owns the Hotel. As such, defendant exerts corporate control over the Hotel.

#### (2) Debt Collection Solely for Affiliate(s)

Defendant manages only the Hotel and not any other hotel or residence; thereby satisfying the second element. While affiliates of defendant manage two other hotels (the Aurora and the Prince George), such affiliates are different corporate entities than defendant. Plaintiffs ask us to pierce the corporate veil of these other entities. For reasons examined later, however, we decline to do so.

#### (3) Principal Business Not the Collection of Debts

Debt collection is not "the" principal business of defendant.

Two judicial opinions have quantified what the phrase "principal business" means in § 6(B). In one case, the court applied the statutory exemption because no more than 22% of the defendant's total expenses were devoted to debt collection operations. In the other decision, the court likewise deemed a figure of 19% not to comprise "the principal business" of that defendant, whose principal responsibility was the solicitation and marketing of credit accounts, not debt collection. *Pavone v. Citicorp Credit Servs., Inc.* (S.D.Cal.1997) 60 F.Supp.2d 1040, 1046–47, *aff'd,* 172 F.3d 876 (9th Cir.1999); *Meads v. Citicorp Credit Servs., Inc.* (S.D.Ga.1988) 686 F.Supp. 330, 332.

Other cases, though, have applied the § 6(B) exception without resorting to quantification. For example, in one lawsuit, defendant SBI provided a number of services to its affiliate, American General Finance Center ("AGFC"), besides debt collection:

> Among other things, SBI answers customer service telephone lines, provides services to cardholders whose cards are lost or stolen, and responds to questions from customers regarding monthly statements and billing disputes. In addition, SBI handles AGFC's marketing, manages its vendor and supplier mail solicitations, assures compliance with Mastercard and VISA rules, oversees the computerized credit card account system, provides security services, and investigates fraudulent activity.

*Aubert v. American Gen. Fin., Inc.* (7th Cir.1998) 137 F.3d 976, 978; *see also Friedman v. May Dep't Stores Co.* (N.D.Ill.1998) 990 F.Supp. 571, 575; *Harrison,* 968 F.Supp. at 843–45.

■ In the instant case, defendant need only show that debt collection does not represent its single most significant activity. In fact, defendant lists its numerous other activities:

> [Defendant] obtains charitable grants... In the [Hotel], [defendant] is responsible for, *inter alia,* resident relations, maintenance, security, billing residents for and collecting rents..., and insuring that [the] Hotel complies with all financial and record-keeping requirements to maintain their tax credits in good standing. Additionally, the defendant provides job training and development to the residents..., and coordinates both social events and numerous community services.

(Haggerty Aff. ¶¶ 6, 21).

That is, unlike an ordinary managing agent of a typical rental property, defendant dedicates itself to proving affordable housing to low-income people by "integrat[ing] comprehensive social and employment services and a supportive community to ensure that individuals remain stable and housed." (*Id.* ¶ 20). While

plaintiffs make sarcastic remarks about defendant's true motives for its alleged philanthropy, they do not deny that defendant engages in a host of endeavors. On the record before us, it stretches belief to conclude that defendant's single largest or most important business is debt collection. Rather, this case seems analogous to *Aubert, Friedman, Pavone,* and *Meads,* in which the § 6(B) exception removed the respective defendants from the Act's scope.

We cannot now give an exact percentage of defendant's expenses or revenue allegedly derived from rent collection. However, we have evidence before us that defendant receives revenue from many sources, including "three revenue generating businesses; individual donors; and support from over forty separate corporate, foundation, and governmental entities." (Pls. Supplemental Aff., Ex. B, at 4 (defendant's web page, <www.commonground.org>)).

Moreover, only 43 of approximately 650 tenants of the Hotel (or 6.6%) were served with rent demands during a recent 14–month period. Finally, we note that at any given time, defendant employs at most only one "rent administrator." Surveying the record as a whole, we find as a matter of law that defendant has not engaged in sufficient rent collection for that function to constitute its primary business.

The instant plaintiffs and some courts have voiced concern that § 6(B) creates a loophole in the law, because an unscrupulous company can "simply organize its corporate activities so as to avoid coverage of the statute." *Pavone,* 60 F.Supp.2d at 1048. One may argue that "the FDCPA should not permit a creditor to have debt collection activities conducted by a subsidiary, while evading FDCPA coverage by assigning other activities to that subsidiary so that debt collection is not its principal

business." *Id.; cf. Harrison,* 968 F.Supp. at 844–45; *Aubert,* 137 F.3d at 979. As noted above, Congress included the § 6(B) exception because it believed that creditors' affiliates would usually try to safeguard the corporate group's good name. However, the predatory efforts of a related entity that does not publicize its affiliation may not tarnish the "good will" of the related creditor.

■ While this raises a "strong policy argument," we must enforce an unambiguous statute according to its terms and leave to Congress the task of closing a potentially dangerous loophole. *Id.; Pavone,* 60 F.Supp.2d at 1048.

Furthermore, the Hotel's residents may well recognize defendant by name not merely as the Hotel's "agent" (as expressly noted on the rent requests) but also as more actively involved in the Hotel's mission and development. After all, the residents receive social, medical, and employment services from defendant, and likely will have future contact with it. So, the continuing good will of the Hotel seems firmly tied to that of defendant. Hence, Congress' intent appears well-served by permitting the exception in this case even if we had the power to close the "loophole" with regard to a faceless and seemingly independent debt collection agency. *Cf. Meads,* 686 F.Supp. at 334.

■ There is, however, a loophole to the loophole. If in equity we "pierce the corporate veil" of a defendant that uses its corporate identity merely as a shield to avoid the law, then § 6(B) would not protect the single, unified entity so "pierced." The § 6(B) exception on its face applies only to separate but "affiliated" entities. Consequently, the unified entity may fall within the Act's definition of "debt collector" if, e.g., it invokes a pseudonym on its debt collection notices.[2]

---

2. "As a general matter, creditors are not subject to the FDCPA. However, a creditor becomes subject to the [Act] if the creditor 'in the process of collecting his own debts, uses any name other than his own which would

indicate that a third person is collecting or attempting to collect such debts.' 15 U.S.C. § 1692a(6). A creditor uses a name other than its own when it uses a name that implies that a third party is involved in collecting its

■ In order not to circumvent Congress' prerogative to fashion its exemption, we must pierce the veil only in extraordinary circumstances. That is, we must invoke the doctrine only as it has been available historically. A couple of the published cases involving the affiliate exemption have mentioned the possibility of piercing the veil, but none have actually done so. *See Harrison,* 968 F.Supp. at 845; *Aubert,* 137 F.3d at 979. Occasionally, however, a tribunal has pierced the veil of a FDCPA defendant in a particularly egregious situation. *See, e.g., West v. Costen* (W.D.Va.1983) 558 F.Supp. 564, 584–87; *United States v. ACB Sales & Serv., Inc.* (D.Ariz.1984) 590 F.Supp. 561, 574–76.

■ On the facts of the instant cases, we refuse to disregard corporate formalities.[3] In New York, courts apply the doctrine reluctantly and only when "the subsidiary is so dominated by the parent company that it is merely an instrumentality of the parent." *Harrison,* 968 F.Supp. at 845. Thus, the fact that a parent corporation "approved" both the collection demand form and the deceptive practices of its subsidiary did not suffice to render the defendants a single economic enterprise. *Id.; cf. Stepney v. Outsourcing Solutions, Inc.* (N.D.Ill. Nov. 13, 1997) No. 97 C 5288, 1997 WL 722972, *2–3 (allegations that defendant parent bought portfolios of consumer debts, implemented the policies and practices of its subsidiary collection company, and financed the collection activities at issue failed to support veil-piercing).

> To determine whether or not a corporation is the alter ego of another, a variety of factors are examined including the sharing of a common office, staff, and ownership; the intermingling of funds;

> debts, pretends to be someone else, or uses a pseudonym or alias." *Maguire v. Citicorp Retail Servs., Inc.* (2d Cir.1998) 147 F.3d 232, 235 (internal quotation marks and citation omitted).

**3.** We leave for the moment technical questions about exactly how, in equity, we might disregard the corporate formalities here.

the treatment of the corporations as one, not separate, profit centers; the absence of formalities and paraphernalia of corporate existence; and any inadequate capitalization.

*Farber v. NP Funding II L.P.* (E.D.N.Y. Dec. 9, 1997) No. 96 Civ. 4322, 1997 WL 913335, *2 (citing *Passalacqua Builders Inc. v. Resnick Dev. S. Inc.* (2d Cir.1991) 933 F.2d 131, 139).

■ In applying these factors, "there is a presumption of separateness... which is entitled to substantial weight." *American Protein Corp. v. AB Volvo* (2d Cir.) 844 F.2d 56, 60, *cert. denied,* 488 U.S. 852, 109 S.Ct. 136, 102 L.Ed.2d 109 (1988) (citation omitted). The required domination or control need not be complete as to every detail, but it must be complete with respect to the transaction attacked. *See id.*

■ In the case at bar, some of these factors favor plaintiffs, but the majority favor defendant. First, defendant maintained its offices at the Hotel, and it arguably holds itself out as sharing some staff with the Hotel (although the two entities maintain separate payrolls and file separate payroll taxes). Further, defendant's president admits that, "for all intents and purposes, [defendant] is an owner of the [Hotel]." (Haggerty Aff. ¶ 7). Also, defendant comprehensively manages services at the premises.

On the other hand, we have no evidence whatsoever that (1) the two entities intermingle funds or otherwise operate as a single economic enterprise, beyond the sharing of facilities and employees; (2) either is inadequately capitalized; or (3) they have not followed proper formalities.

> Technically, the veil-piercing doctrine may not apply to limited partnerships, such as the Hotel, as opposed to corporations and limited liability corporations. We may have to apply agency law instead, which is of limited utility in this specific context. *See, e.g., Peters v. AT & T Corp.* (N.D.Ill.1998) 179 F.R.D. 564, 568.

In short, the record fails to show that the Hotel has none of its own functions, fulfilled by its own officers and staff and financed by its own bank accounts. This arrangement does not constitute the sort of total domination that would lead us to pierce the veil in this context.

Plaintiffs also urge us to pierce the veil of the defendant's other affiliates (which manage the Prince George Hotel and the Aurora Hotel). If we did so, then § 6(B) would no longer shelter defendant in this litigation. Plaintiffs aver that defendant created these affiliates only after related litigation began in state court and solely to evade the Act. Also, defendant holds itself out on its web page as the manager of both other hotels. Finally, plaintiffs could not access certificates of incorporation on file, and thus they request a negative inference.

We do not find these arguments persuasive. Defendant has submitted to us documents establishing the other hotels' managers as separate legal entities, and we have seen no compelling evidence of bad faith or intermingling. In this context, imprecise wording on a web page should not eliminate corporate protection. More importantly, as analyzed above, the fact that defendant broadcasts to tenants its pervasive involvement in the management of these properties demonstrates that it is not a faceless, opportunistic entity of the sort that Congress intended to regulate.

## CONCLUSION

We hereby GRANT summary judgment to defendant and direct the Clerk to dismiss both complaints with prejudice.

**SO ORDERED.**