CONSOLIDATED EDISON CO. OF NEW YORK, INC., Plaintiff,

v.

UGI UTILITIES, INC., Defendant.

No. 01 Civ. 8520(DC).

United States District Court, S.D. New York.

March 29, 2004.

Dickstein Shapiro Morin & Oshinsky LLP, Washington, DC by David L. Elkind, Andrew C. Cooper, Keisha A. Gary, for Plaintiff.

Foley & Lardner, Washington, DC, by Jay N. Varon, James M. Caragher, Jessica H. Jones, Polstein Ferrara Dwyer & Speed, New York City, by Anthony J. Ferrara, for Defendant.

### OPINION

CHIN, District Judge.

In this case, brought pursuant to the Comprehensive Environmental Response,

Compensation and Liability Act ("CERC-LA"), 42 U.S.C. §§ 9601–9675, plaintiff Consolidated Edison Company of New York, Inc. ("Con Ed") seeks to hold defendant UGI Utilities, Inc. ("UGI") liable for environmental response costs related to soil and groundwater contamination from manufactured gas plant ("MGP") activities undertaken from 1898 to 1904 at sites owned by a subsidiary and a predecessor of UGI. Defendant moves for summary judgment pursuant to Fed.R.Civ.P. 56. For the reasons set forth below, defendant's motion is granted.

## STATEMENT OF THE CASE

### I. The Facts

For purposes of this motion, the facts are construed in the light most favorable to Con Ed as the party opposing summary judgment.

### A. The Origins of UGI, 1882–1887

United Gas Improvement Company ("UGIC") was formed in June 1882 by a group of Philadelphia business men for the purpose of "manufacturing gas and gas-making machinery" based on the patent for a "water gas" process and apparatus, obtained in April 1882 from inventor Thaddeus S.C. Lowe. (Def. Exh. 2 at 32, 34–39; Gary Aff., Exh. 4 at UGI 1353; Gary Aff., Exh. 3 at UGI 5332). Lowe water gas was an improvement over coal gas because it produced more light at a lower cost. (Gary Aff., Exh. 4 at UGI 1353). UGIC sought ways to exploit and use this new technology, including by purchasing certain existing gas works, establishing or building new gas works that it would use itself or sell to others, and entering into agreements to operate certain gas plants

in return for a share of the profits. (Def. Exh. 2 at 32–33; Def. Exh. 4 at 89; Gary Aff., Exh. 5 at 96).

Under Pennsylvania law, UGIC could not hold stocks in another corporation. (Gary Aff., Exh. 5 at 96). Accordingly, in 1887, the owners of UGIC formed a new company called the Union Company and used it to acquire an old Pennsylvania corporate charter with broad powers that included the right to own other corporations. (Def. Exh. 4 at 89; Gary Aff., Exh. 5 at 96–97). The name of this new company was then changed to *The* United Improvement Company ("TUGIC"). (*Id.*).

### B. UGI Acquisitions in New York, 1888–1900

TUGIC, which would later become UGI, purchased all of the assets of UGIC in 1888 and then used the charter to acquire gas and electric properties across the United States. (*Id.;* Def. Exh. 3 at 62–67).

UGI[1] acquired ownership interests in the White Plains Lighting Company and Hudson River Gas & Electric Company of Tarrytown in 1898 and 1900, respectively. (Gary Aff., Exh. 29; Exh. 33 at ENV 93, 95; Def. Exh. 9 at 276).

In a January 1900 Board Meeting, UGI President Thomas Dolan reported that UGI had acquired interests in, *inter alia,* New Rochelle Electric Company, Pelham Electric Light and Power Company, Port Chester Electric Light Company, and the White Plains Electric Company. (Def. Exh. 6 at 114). Dolan also reported that UGI had organized a company known as Westchester Gas and Coke Company, which had gas franchises in Mount Vernon and New Rochelle. (*Id.*).

---

**1.** UGIC, TUGIC, and the currently named UGI are all collectively referred to herein as "UGI," unless otherwise indicated.

In March 1900, UGI acquired the New York Suburban Gas Company ("New York Suburban") from the American Gas Company ("American Gas") (Def.Exh. 7), itself a consolidation of utility companies owned by American Gas—the Eastchester Gas Light Company, the Pelham Gas Light Company, the Larchmont Gas Company, the Westchester Gas and Electric Company, and the New Rochelle Gas and Fuel Company. (Def.Exh. 8). UGI thereby acquired interests in MGP sites in Mount Vernon, New Rochelle, Pelham, Port Chester, and Rye.

Each company in which UGI invested had a superintendent who oversaw the day-to-day activities of the gas plant. (Macey Dep. at 292–94). UGI developed an audit system pertaining to its various subsidiaries' budgets, expenditures, and best practices. (Def. Exh. 4 at 98).

According to an April 9, 1894 account in the Daily Philadelphia Stockholder describing UGI, each UGI subsidiary

"should have a separate and independent organization, reporting, however, to the head office in [Philadelphia].... The local superintendents are thus kept in close touch with the home office, and they take no important step which is not specifically authorized. While their instructions are to purchase in the city where each plant is located all needful supplies obtainable there, and thus give to each city the benefit of outlays in part incidental with the carrying on of the business, supplies, such as coal, oil, cast iron pipe, etc., are purchased through the home office, in order that here in the East the company may secure the benefit of minimum prices. Attached to the company is a corps of traveling auditors, one of whom visits each local company every three months and makes an examination of its operations and reports thereon to the home office.... Not a

dollar is outlayed for its account at any point or for any purpose which is not first approved at the home office, and there is the closest scrutiny into each item of expense.... Annually there is a convention of superintendents of the local companies, presided over by the general superintendent, at which, besides reports of each as to the operations of the plant or plants under his control, papers are read on practical subjects relating to the objects of the company, etc."

(Gary Aff., Exh. 6 at 2).

### C. *Formation and Operation of WLC*

#### 1. *Formation*

In November 1900, UGI organized a new subsidiary to be called the Westchester Lighting Company ("WLC"). (Def. Exh. 10 at CE/UGI 6375). WLC was incorporated for the purpose of "manufacturing and supplying gas for lighting the streets and public and private buildings or cities, villages and towns in the State of New York, and for manufacturing and using electricity for producing light, heat and power...." (Def. Exh. 10 at 281). UGI owned more than 80% of WLC's total shares. (Def. Exh. 11 at 535).

At their first board meeting on November 9, 1900, WLC's nine directors appointed a special committee to "investigate and make inquiry" into the desirability of acquiring the various Westchester gas and electric entities owned by UGI. (Def. Exh. 11 at 295, 297). The committee, with the help of a gas and electric light business expert, approved the proposed acquisition and merger. (*Id.*).

On November 30, 1900, the WLC board acquired and then merged the companies in which it had obtained interests: the Pelham Electric Light and Power Company, Port Chester Electric Lighting Compa-

ny, Larchmont Electric Light Company, Eastchester Electric Company, and the Westchester Gas and Coke Company. (Def. Exh. 11 at 307–13). Accordingly, WLC became the owner of MGP sites in Rye, Mount Vernon, Pelham, Port Chester, and New Rochelle.

In February 1901, WLC purchased the Hudson River Gas and Electric Company and the White Plains Lighting Company. (*Id.* at 459–61). In November 1902, WLC merged the companies into WLC. (*Id.*). WLC thus became the owner of MGP sites in Tarrytown and White Plains.

### 2. *Operations*

#### a. *Board of Directors*

Upon WLC's creation in 1900, none of the first nine men listed in the WLC Certificate of Incorporation and selected to serve on WLC's board were dual officeholders. (Def. Exh. 11 at 289; Def Exh. 12 at 724). At no time during 1900 to 1904 did UGI directors, officers, or employees constitute a majority of the directors or officers of WLC. (Def. Exh. 12 at 724–25).

During the first months of the WLC board's existence, the directors appointed an executive committee to help manage the company, elected its president who would serve for the next four years, and reviewed the strength of each constituency company before effecting the large-scale merger. (Def. Exh. 11 at 296–301, 446).

In 1901, three of the nine WLC directors held UGI senior executive positions. (Def. Exh. 12 at 724). Two of the other board members—A.M. Young and R.A.C. Smith—had worked "in conjunction" with UGI to acquire possession of the New Rochelle Electric Company, Pelham Electric Light and Power Company, Port Chester Electric Light Company, Larchmont Electric Light Company, Eastchester Electric Company, and White Plains Electric Company. (Def. Exh. 6 at 114; Exh. 11 at 446–47).

In 1902 and 1903, four of the eleven WLC directors held UGI senior executive positions. (*Id.*). In 1904, four, then five, of eleven directors held UGI senior executive positions. (*Id.*).

From 1900 to 1904, UGI senior executives never held the positions of WLC president, vice president, or secretary. (*Id.*). UGI executives did hold positions as WLC treasurer, assistant secretary, and managing director. (*Id.*). Specifically, UGI's treasurer Lewis Lillie was elected to assistant secretary and treasurer of WLC. (Def. Exh. 11 at CE/UGI 12469, 19079). UGI's general superintendent Walton Clark was named WLC managing director. (*Id.* at CE/UGI 19078).

The managing director "shall have the general management of the business and properties of the company, and shall perform such other duties as may be imposed upon him by the board of directors." (Def. Exh. 11 at CE/UGI 12387). According to the WLC bylaws, the duties of WLC's president included "presid[ing] at all meetings of the board of directors," "act[ing] as temporary chairman at and call[ing] to order all meetings of the stockholders," "countersign[ing] all checks, and . . . sign[ing] drafts, notes, certificates of stock, and all contracts and other instruments, unless otherwise ordered by the board." (Def. Exh. 11 at CE/UGI 12385). The president also "shall, under the control of the directors, have the general management of the company's affairs, and shall perform all duties incidental to his office." (*Id.*).

#### b. *WLC Executive Committee*

In January 1901, the WLC board of directors appointed an "executive committee," which was "in the recess of the Board [to] have full power to direct and manage

the business affairs of the company in such manner as such committee shall deem best for the interests of the company in all cases in which specific directions have not been given by the Board." (Def. Exh. 11 at 446). The committee consisted of four members of the WLC board with the WLC president W.W. Scrugman serving in an ex-officio capacity. (*Id.*). Lillie, both UGI's treasurer and WLC's assistant secretary and treasurer, and Clark, UGI's general superintendent and WLC's managing director, filled two of the five executive committee positions. (Def. Exh. 11 at 447). The other positions were filled by board members who were local businessmen but did not hold management positions at WLC. (*Id.*).

According to the WLC Executive Committee minutes for 1900 to 1903 WLC made decisions concerning setting salaries (Def. Exh. 17 at 757–58), approving the sale of various used equipment and materials (*id.* at 788), approving contracts and expenditures for improvements and repairs (*id.* at 753), authorizing changes in gas and electric rates and rate reductions (*id.* at 742, 750–52, 839), setting electric current rates (*id.* at 758), approving the purchase of electric franchises (*id.* at 755), approving the execution of leases (*id.* at 809), and appointing an attorney for legal services. (*Id.* at 887).

In January 1901, UGI was named purchasing agent and consulting engineer for WLC. (Def. Exh. 11 at CE/UGI 19076).

### c. Superintendents of WLC Facilities

Each of the WLC facilities was directed by its own superintendent. (Def. Exh. 17 at 757). According to expert testimony, "the superintendent ... generally runs the facility." (Macey Dep. at 294).

### d. UGI Managing Committee and Works Committee

From 1900 to 1903, UGI had a Managing Committee and a Committee on Works ("Works Committee"), which worked together to monitor UGI's investments and to ensure that extensions, property improvements, and certain supply contracts were reviewed and that UGI's subsidiaries received UGI's expert advice when needed. (Def. Exh. 4 at 97–98). In 1903, UGI president Thomas Dolan described UGI's management of the subsidiaries, stating that "the Works Committee of [UGI] passes favorably upon all property improvements and extensions, and contracts for supplies, before they are authorized. This Committee meets every day." (Gary Aff., Exh. 4 at UGI 1488). UGI's corporate history indicates that the Works Committee consisted of top UGI executives— President Dolan, Vice President and General Manager Samuel Bodine, Vice President and General Counsel Randal Morgan, General Superintendent Walton Clark, and Treasurer Louis Lillie. (Def. Exh. 4 at UGI 1488–89). In 1904, both the managing and works committees were abolished in favor of a single executive committee. (Def. Exh. 18 at 1061).

### e. UGI Advice to WLC

A May 4, 1903 letter to UGI shareholders from UGI president Dolan stated that UGI provided "advice" to the companies in which UGI held interests "in the purchase of supplies, in laying out, construction and operation of plants, in solving legal and financial problems, in canvassing for new business and in all the details which make for success in the management of a manufacturing company selling its wares to an entire community." (Def. Exh. 4 at UGI 1489). UGI offered its "advice," in part, through the annual meeting of "the Superintendents and the Commercial Agents of

all the companies … in [Philadelphia, UGI's headquarters,] … to read and discuss carefully prepared papers upon the various technical and commercial problems of the business in which they are engaged." (*Id.*).

### f. *Macey Expert Report*

Con Ed's corporate governance expert Jonathan Macey concludes that "UGI controlled every material aspect of the operations of [WLC]" and "controlled all of the important facets of its policies and operations, down to the smallest details." (Def. Exh. 1 at 2). Macey further states that UGI "controlled every aspect of the corporate existence of [WLC] from its birth to its corporate death." (*Id.* at 6). Macey points, as illustration, to the UGI executive committee's approval throughout 1904 of WLC actions, including employment decisions, contracts for coal, sales of property, and purchases of equipment for the MGPs. (*Id.* at 6–9).

### 3. *Con Ed's Purchase of WLC*

On July 1, 1904, Con Ed entered into an agreement with UGI to purchase its ownership interest in WLC. (Def.Exh. 20). The WLC board of directors authorized the transaction on July 8, 1904. (Def. Exh. 11 at 533–624). The agreement was consummated on October 20, 1904 when WLC's stockholders and board of directors granted authorization for WLC to transfer all of its rights and property to a new Con Ed subsidiary known as the New York and Westchester Lighting Company. (Def.Exh. 11). That same day, New York and Westchester Lighting Company merged into WLC (*Id.* at 682–83), and Con Ed controlled WLC, with whom it eventually merged in 1951. (Def.Exh. 21).

### E. *American Gas's Operations, 1890–1900*

Prior to UGI's purchase of New York Suburban from American Gas in March 1900, American Gas owned the MGP sites in Mount Vernon, New Rochelle, Pelham, Port Chester, and Rye. Con Ed alleges that American Gas incurred CERCLA liability through its control over its Westchester County subsidiaries from 1890 to 1900 and that UGI succeeded to this liability when American Gas merged into UGI in 1925. (Pl.Surr.1).

### 1. *Dual Officers/Directors*

American Gas installed its own corporate officers and directors as officers and directors of its Westchester County subsidiaries. (Gary Aff., Exh. 22 at UGI 5–6; Exh. 17 at ENV 22, 24, 25; Exh. 23 at CE/UGI 27296; Exh. 24 at CE/UGI 12361; Def. Exh. 8). In the December 16, 1891 American Gas Board minutes, American Gas's Solicitor Thomas Leaming described the annual meeting of Eastchester Gas Company ("Eastchester Gas"), which owned the Mount Vernon MGP:

> [T]he General Manager, Treasurer and myself went to New York, held the annual meeting of the company, adopted a simple form of by-laws, elected directors, and afterward held a board meeting and elected officers. Messrs. Carpender, Penford, and Crawley were made the New York directors with Messrs. [Ramsdale] and Stroud. Mr. Carpender was elected President, Mr. [Ramsdale] General Manager, and Mr. Stroud Treasurer and Sec'y.

(Gary Aff., dated Nov. 24, 2003, Exh. 1 at UGI 7073). Carpender was American Gas's president. Penford and Crawley were Carpender's law firm partners and served on American Gas's board of directors. Ramsdale was American Gas's general manager. Stroud was American Gas's treasurer. (Pl.Surr.2).

### 2. *Observance of Corporate Separateness*

Plaintiff alleges that American Gas failed to observe "corporate separateness."

(Pl.Surr.3). According to the October 26, 1893 minutes, American Gas's general manager Ramsdale, as general manager of the New Rochelle subsidiary, had entered into a construction contract listing himself as general manager of American Gas, "the contract showing of course, a profit to the latter company, and he is thus acting in a double capacity." (Gary Aff., dated Nov. 23, 2003, Exh. 1 at UGI 7207). The contract was subsequently approved by the subsidiary's board of directors and signed on behalf of the company by its president. (*Id.*).

### 3. *American Gas's Subsidiary Operations*

American Gas's board of directors approved decisions pertaining to the subsidiaries' management, including equipment purchases for the MGPs, formation of contracts, and property extensions. (*Id.*, Exh. 25 at UGI 756).

American Gas's general manager Ramsdale served as the general manager for all of the Westchester subsidiaries. (Gary Aff., Exh. 23 at CE/UGI 27296; Exh. 25). The superintendent of each MGP reported to Ramsdale and obtained his approval before taking any action. (*Id.*, Exh. 23 at CE/UGI 27286–87; Exh. 24 at CE/UGI 12360). Ramsdale regularly visited each MGP to monitor its operations. (*Id.*, Exh. 25 at UGI 744–45).

According to the June 17, 1891 American Gas board minutes, the company approved the purchase and erection of a purifier plant at Eastchester Gas Company's Mount Vernon MGP. (Gary Aff., dated Nov. 24, 2003, Exh. 1 at UGI 7044). According to the April 20, 1892 and May 18, 1892 minutes, American Gas approved the purchase and installation of a new water gas plant from UGI for the Mount Vernon MGP. (*Id.*, Exh. 1 at UGI 7104–06). In the April 5, 1892 minutes, American Gas's management referred to the Mount Vernon MPG as "works operated by [American Gas]." (*Id.*, Exh. 1, at UGI 7090).

According to the November 15, 1893 minutes, American Gas decided to reduce the amount of insurance held on the New Rochelle Gas Company's MGP in New Rochelle. (*Id.*, Exh. 1 at UGI 7211). The February 21, 1894 minutes state that American Gas approved the replacement of the gas manufacturing apparatus at the New Rochelle MGP with parts from another American Gas MGP plant. (*Id.*, Exh. 1 at UGI 7226–27). According to the May 18, 1892 minutes, American Gas "assumed control of the operations of the plant [at New Rochelle], ... and made very considerable change." (*Id.*, Exh. 1 at UGI 7106). Specifically, American Gas made changes to the plant's oil purchasing agreement. (*Id.*).

### 4. *American Gas's Merger into UGI in 1925*

American Gas merged into UGI in 1925, leaving UGI as the surviving company. (Gary Aff., Exh. 21). The "Agreement of Consolidation and Merger" stated that UGI and American Gas became "one corporation under the name [UGI] ... possessing all of the rights, privileges and franchises theretofore vested in each of them" and "all debts not of record, duties and liabilities of each of said constituent corporations shall thenceforth attach to the consolidated corporation, and may be enforced against it." (*Id.*, Exh. 21 at UGI 6976).

### F. *Environmental Contamination*

According to Con Ed's environmental expert, Robert M. Karls, the contamination at the Rye, Mount Vernon, Pelham, and Port Chester MGPs was caused by the releases from "routine operations" at those facilities occurring during the intervals

from the installation of MGP equipment through the end of gas production at those sites. (Gary Aff., Exh. 30 at 12, 14, 20, 24).

Con Ed has performed no environmental testing at the MGP sites in New Rochelle, Rye, and Mount Vernon. (Wilcken Dep. at 67–68, 115, 128, 188). The extent of contamination has not been determined at the White Plains site. (*Id.* at 150–52). Con Ed has been or will be contributing to cleanups being performed by successor owners at Port Chester and Pelham and has conveyed the MGP site and agreed to pay a fixed sum for environmental liabilities at Tarrytown. (*Id.* at 92–94, 159–60, 219). Pursuant to a Voluntary Cleanup Agreement with the New York State Department of Environmental Conservation ("NYSDEC"), Con Ed is required to investigate and remediate all of its former MGP sites, including those at issue in this action. (Gary Aff., Exhs. 31, 32). In complying with the Agreement, Con Ed has spent more than $4 million to investigate and clean up the MGP sites at issue. (Wilcken Aff. ¶ 3). Con Ed expects to expend in excess of $100 million to complete the investigation and remediation of all of the MGP sites at issue. (*Id.* ¶ 4).

## II. *Prior Proceedings*

Con Ed filed the original complaint in this action on September 20, 2001. Con Ed filed an amended complaint on March 4, 2002. After discovery, UGI moved for summary judgment pursuant to Fed. R.Civ.P. 56. The Court heard oral argument on the motion for summary judgment on November 25, 2003. Ruling from the bench, the Court granted the motion in part and reserved decision in part. The Court dismissed all derivative liability claims, predicated on piercing the corporate veil, including the state law claims, and all claims with respect to the Yonkers

MGP sites. (Tr. 47–48). The Court reserved decision as to the remaining operator liability claims with respect to the other seven sites. (*Id.* 48).

## DISCUSSION

### I. *Applicable Law*

#### A. *Summary Judgment Standard*

Summary judgment will be granted when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Accordingly, the Court's task is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Summary judgment is inappropriate if, resolving all ambiguities and drawing all inferences against the moving party, there exists a dispute about a material fact "such that a reasonable jury could return a verdict for the nonmoving party." *Id.* 477 U.S. at 248, 106 S.Ct. 2505; *see Bay v. Times Mirror Magazines, Inc.*, 936 F.2d 112, 116 (2d Cir.1991). A factual issue is genuine if it can reasonably be resolved in favor of either party. *Anderson*, 477 U.S. at 250, 106 S.Ct. 2505. A fact is material if it can affect the outcome of the action based on the governing law. *Id.* at 248, 106 S.Ct. 2505.

The party seeking summary judgment must demonstrate the absence of genuine issues of material fact, and then the nonmoving party must set forth facts proving that there is a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 321–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). To defeat a motion for summary judgment,

the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586, 106 S.Ct. 1348. The nonmoving party "must present concrete particulars and cannot succeed with purely conclusory allegations." *Fitch v. R.J. Reynolds Tobacco Co.*, 675 F.Supp. 133, 136 (S.D.N.Y.1987) (internal quotations omitted). There is no issue for trial unless there exists sufficient evidence in the record favoring the party opposing summary judgment to support a jury verdict in that party's favor. *Anderson*, 477 U.S. at 249–50, 106 S.Ct. 2505. As the Court held in *Anderson*, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* (citations omitted). The plaintiff must provide the Court with some basis to believe that her "version of relevant events is not fanciful." *Christian Dior–New York, Inc. v. Koret, Inc.*, 792 F.2d 34, 38 (2d Cir.1986) (internal quotations omitted).

## B. *Operator Liability Pursuant to CERCLA*

■ Liability under CERCLA attaches, *inter alia*, to "any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of." 42 U.S.C. § 9607(a)(2). An "operator" is "any person ... operating" the relevant facility. 42 U.S.C. § 9601(20)(A)(ii).[2] "[U]nder CERCLA, an operator is simply someone who directs the working of, manages, or conducts the

affairs of a facility." *United States v. Bestfoods*, 524 U.S. 51, 66–67, 118 S.Ct. 1876, 141 L.Ed.2d 43 (1998).

■ CERCLA operator liability, however, requires that the operator's control over the facility relate to pollution control or waste disposal. "To sharpen the definition for purposes of CERCLA's concern with environmental contamination, an operator must manage, direct, or conduct operations specifically related to pollution, that is, operations having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations." *Bestfoods*, 524 U.S. at 66–67, 118 S.Ct. 1876; *see also Commander Oil Corp. v. Barlo Equip. Corp.*, 215 F.3d 321, 332 n. 3 (2d Cir.2000) (in holding that operator liability did not apply, noting that, under facts, defendant could not be said to have "manage[d], direct[ed], or conduct[ed] operations specifically related to pollution, that is, operations having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations") (quoting *Bestfoods*, 524 U.S. at 66–67, 118 S.Ct. 1876); *United States v. Green*, 33 F.Supp.2d 203, 217 (W.D.N.Y. 1998) (holding that defendant could not be found liable as an operator because of absence of evidence that he directly participated in the management of facility's pollution control operations, including decisions pertaining to the disposal of hazardous substances and compliance with environmental regulations).

---

**2.** "Person" is defined in CERCLA to include corporations and other business organizations. 42 U.S.C. § 9601(21). "Facility" means: "(A) any building, structure, installation, equipment, pipe or pipeline (including any pipe into a sewer or publicly owned treatment works), well, pit, pond, lagoon, impoundment, ditch, landfill, storage container, motor vehicle, rolling stock, or aircraft, or (B) any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located; but does not include any consumer product in consumer use or any vessel." 42 U.S.C. § 9601(9).

Derivative liability cases, which are based on piercing the corporate veil, are distinct from operator liability cases, in which the parent's liability is direct. "[D]erivative liability cases are to be distinguished from those in which 'the alleged wrong can seemingly be traced to the parent through the conduit of its own personnel and management' and 'the parent is directly a participant in the wrong complained of.' ... In such instances, the parent is directly liable for its own actions." *Bestfoods*, 524 U.S. at 64–66, 118 S.Ct. 1876 (quoting Douglas & Shanks, Insulation from Liability Through Subsidiary Corporations, 39 Yale L.J. 193, 207, 208 (1929)). "CERCLA's 'operator' provision is concerned primarily with direct liability for one's own actions." *Id.* at 65, 118 S.Ct. 1876. "If any such act of operating a corporate subsidiary's facility is done on behalf of a parent corporation, the existence of the parent-subsidiary relationship under state corporate law is simply irrelevant to the issue of direct liability." *Id.*

Prior to *Bestfoods*, some circuits applied the "actual control" test to determine operator liability, looking to "whether the parent 'actually operated the business of its subsidiary.'" *Id.* at 68, 118 S.Ct. 1876 (citing *United States v. Kayser–Roth Corp.*, 910 F.2d 24, 27 (1st Cir.1990)) (operator liability "requires active involvement in the affairs of the subsidiary"); *Jacksonville Elec. Auth. v. Bernuth Corp.*, 996 F.2d 1107, 1110 (11th Cir.1993) (parent is liable if it "actually exercised control over, or was otherwise intimately involved in the operations of, the [subsidiary] corporation immediately responsible for the operation of the facility"); *see also City of New York v. Exxon Corp.*, 112 B.R. 540, 548 n. 9 (S.D.N.Y.1990) ("We believe that some degree of active participation in and actual control over the affairs of the subsidiary is necessary"); *cf. State of Idaho v. Bunker Hill Co.*, 635 F.Supp. 665, 672 (D.Idaho 1986) (determining whether owner or operator liability applied based on whether defendant had "capacity" to prevent and abate environmental damage). Morever, some courts have referred to "owner or operator liability" as one form of liability, implying the interchangeability of these two distinct bases. *See, e.g., Joslyn Mfg. Co. v. T.L. James & Co.*, 893 F.2d 80 (5th Cir.1990); *Bunker Hill*, 635 F.Supp. at 672.

The Court in *Bestfoods* held, however, that the "actual control" test wrongly combines direct and indirect liability. *Id.* at 67, 118 S.Ct. 1876. " 'The question is not whether the parent operates the subsidiary, but rather whether it operates the facility, and that operation is evidenced by participation in the activities of the facility, not the subsidiary. Control of the subsidiary, if extensive enough, gives rise to indirect liability under piercing doctrine, not direct liability under the statutory language.' " *Id.* at 68, 118 S.Ct. 1876 (citing Lynda J. Oswald, Bifurcation of the Owner and Operator Analysis under CERCLA, 72 Wash. U. L.Q. 223, 269 (1994)) and *Schiavone v. Pearce*, 79 F.3d 248, 254 (2d Cir. 1996) ("Any liabilities [the parent] may have as an operator, then, stem directly from its control over the plant").

The Supreme Court in *Bestfoods* contemplated three scenarios in which operator liability might arise, based on a parent company's direct pollution-related action vis-à-vis a facility. 524 U.S. at 71, 118 S.Ct. 1876. First, a parent might be held directly liable when "the parent operates the facility in the stead of its subsidiary or alongside the subsidiary in some sort of joint venture." *Id.*

Second, direct liability might arise when "a dual officer or director ... depart[s] so far from the norms of parental influence exercised through dual of-

ficeholding as to serve the parent, even when ostensibly acting on behalf of the subsidiary in operating the facility." *Id.* Evidence of common directors or officers between a parent and its subsidiary, however, is insufficient on its own to expose the parent to direct liability under CERCLA. *American Protein Corp. v. AB Volvo,* 844 F.2d 56, 57 (2d Cir.), *cert. denied,* 488 U.S. 852, 109 S.Ct. 136, 102 L.Ed.2d 109 (1988); *see also Kingston Dry Dock Co. v. Lake Champlain Transp. Co.,* 31 F.2d 265, 267 (2d Cir.1929); *Bestfoods,* 524 U.S. at 69, 118 S.Ct. 1876. Courts generally presume that directors "are wearing their 'subsidiary hats' and not their 'parent hats' when acting for the subsidiary." *Bestfoods,* 524 U.S. at 69, 118 S.Ct. 1876 (citing P. Blumberg, Law of Corporate Groups: Procedural Problems in the Law of Parent and Subsidiary Corporations § 1.02.1, p. 12 (1983)); *United States v. Jon–T Chemicals, Inc.,* 768 F.2d 686, 691 (5th Cir.1985), *cert. denied,* 475 U.S. 1014, 106 S.Ct. 1194, 89 L.Ed.2d 309 (1986). To establish liability, a plaintiff seeking to establish a parent's liability based on common directors or officers must demonstrate that, despite the general presumption to the contrary, the officers and directors "were acting in their capacities as [the parent's] officers and directors, not as [the subsidiary's] officers and directors, when they [made policy decisions and supervised activities at the facility]." *Id.* at 70, 118 S.Ct. 1876; *see also Raytheon Constructors, Inc. v. Asarco, Inc.,* No. 00–1500, 00–1530, 2003 WL 984623, at \*4 (10th Cir. Mar.11, 2003) (holding that fact that shareholder's president acted as president and board member of subsidiary company was insufficient for operator liability in absence of evidence that action was taken in capacity other than as president and board member of subsidiary).[3]

Third, the Court contemplated direct liability when "an agent of the parent with no hat to wear but the parent's hat ... manage[s] or direct[s] activities at the facility." *Id.* at 71, 118 S.Ct. 1876. "[T]he acts of direct operation that give rise to parental liability must necessarily be distinguished from the interference that stems from the normal relationship between parent and subsidiary. Again, norms of corporate behavior (undisturbed by any CERCLA provision) are crucial reference points." *Id.* at 71–72, 118 S.Ct. 1876. "The critical question is whether, in degree and detail, actions directed to the facility by an agent of the parent alone are eccentric under accepted norms of parental oversight of a subsidiary's facility." *Id.* at 72, 118 S.Ct. 1876. "Norms of corporate behavior" are relevant to distinguishing "a parental officer's oversight of a subsidiary from such an officer's control over the operation of the subsidiary's facility." *Id.* at 71–72, 118 S.Ct. 1876.

> '[A]ctivities that involve the facility but which are consistent with the parent's investor status, such as monitoring of the subsidiary's performance, supervision of the subsidiary's finance and capital budget decisions, and articulation of general policies and procedures, should not give rise to direct liability.'

*Id.* at 72, 118 S.Ct. 1876 (quoting Oswald, *supra,* at 282).

**3.** The Court in *Bestfoods* elaborated on this point to highlight the distinction between derivative and direct CERCLA liability:

> Indeed, if the evidence of common corporate personnel acting at management and directorial levels were enough to support a finding of a parent corporation's direct operator liability under CERCLA, then the possibility of resort to veil piercing to establish indirect, derivative liability for the subsidiary's violations would be academic.

524 U.S. at 70, 118 S.Ct. 1876.

### C. *Successor Liability Under CERCLA*

█ Under common law, a corporation acquiring the assets of another corporation only takes on its CERCLA liabilities if any of the following apply: (1) "the successor expressly or impliedly agrees to assume them"; (2) "the transaction may be viewed as a de facto merger or consolidation"; (3) "the successor is the 'mere continuation' of the predecessor"; or (4) "the transaction is fraudulent." *State of New York v. Nat'l Servs. Indus., Inc.*, 352 F.3d 682, 685 (2d Cir.2003) (quoting *B.F. Goodrich v. Betkoski*, 99 F.3d 505, 519 (2d Cir.1996)); *see also Pfohl Bros. Landfill Site Steering Committee v. Allied Waste Sys., Inc.*, 255 F.Supp.2d 134, 162 (W.D.N.Y.2003).

## II. *Application*

The remaining claims in this action are the CERCLA and declaratory judgment claims pertaining to the seven non-Yonkers MGPs located in Rye, Mount Vernon, Pelham, Port Chester, New Rochelle, White Plains, and Tarrytown. Con Ed seeks relief contribution for response costs for operator liability, pursuant to Section 113(f) of CERCLA, 42 U.S.C. § 9613(f)(1). In addition, Con Ed seeks a declaratory judgment, pursuant to Section 113(g)(2) of CERCLA, 42 U.S.C. § 9613(g)(2) and 28 U.S.C. § 2201, as to UGI's liability pursuant to Section 113(f)(1) of CERCLA, 42 U.S.C. § 9613(f)(1).

Con Ed asserts three theories of liability. First, it alleges that, when American Gas merged into UGI in 1925, UGI succeeded to American Gas's CERCLA liabilities incurred through the latter's ownership and operation of five of the seven MGP sites at Rye, Mount Vernon, Pelham, Port Chester, and New Rochelle prior to the sale of the property to UGI in March 1900. (Pl.Mem.32–33). Second, it alleges that operator liability attaches based on UGI's "direct control" over the management of its subsidiaries and the operations of all seven MGPs from 1900 to 1904. (Pl.Mem.28). Third, although styled as owner liability, plaintiff appears to assert operator liability based on UGI's alleged domination and control over the management and operations of the White Plains and Tarrytown MGPs from 1898 and 1900, respectively, until 1902, when White Plains Lighting and Hudson River Gas merged into WLC. (Pl.Mem.36–37).

### A. *UGI's Successor Liability For Rye, Mount Vernon, Pelham, Port Chester, and New Rochelle Based on American Gas Ownership from 1890 to 1900*

█ Con Ed alleges that when American Gas merged into UGI in 1925, UGI succeeded to the CERCLA liability American Gas incurred when it owned and operated the MGP sites at Rye, Mount Vernon, Pelham, Port Chester, and New Rochelle from 1890 to 1900. (Pl. Mem. 32–33; Pl. Surr. 1).

Con Ed's argument assumes that American Gas incurred CERCLA liability based on its ownership of the MGP sites prior to 1900. Con Ed relies primarily on American Gas board minutes from 1890 to 1900 to establish that American Gas's control over the Mount Vernon and New Rochelle MGPs and their operations gave rise to operator liability based on the existence of dual officers and directors, the absence of corporate separateness, and American Gas's control over the MGP operations. Because I have already dismissed all claims predicated on derivative liability, I examine whether any factual issues exist pertaining to American Gas's direct liability as an operator.

Con Ed offers the following as evidence of American Gas's liability. Corporate decisions for the Westchester subsidiaries

were made by American Gas from its offices in Philadelphia. (Gary Aff., Exh. 25). American Gas's board of directors approved decisions pertaining to the subsidiaries' management, including requests for approval of equipment purchases for the MGPs, formation of contracts, and property extensions. (*Id.*, Exh. 25 at UGI 756).

American Gas's general manager served as the general manager for all of American Gas's Westchester subsidiaries. (Gary Aff., Exh. 23 at CE/UGI 27296). The superintendent of each MGP reported to American Gas's general manager and obtained his approval before taking any action. (*Id.*, at Exh. 23 at CE/UGI 27286–87; Exh. 24 at CE/UGI 12360).

American Gas installed its own corporate officers and directors as officers and directors of its Westchester County subsidiaries. (Gary Aff., Exh. 22 at UGI 5–6; Exh. 17 at ENV 22, 24, 25; Exh. 23 at CE/UGI 27296; Exh. 24 at CE/UGI 12361; Def. Exh. 8).

In addition, American Gas approved the purchase and erection of a purifier plant at the Mount Vernon MGP and the purchase and installation of a new water gas plant for the Mount Vernon MGP. (*Id.* at UGI 7044, 7104–06). In the April 5, 1892 minutes, American Gas's management referred to the Mount Vernon MGP as "works operated by [American Gas]." (*Id.* at UGI 7090).

American Gas approved the reduction of insurance on the New Rochelle MGP and the replacement of the gas manufacturing apparatus at the New Rochelle MGP with parts from another American Gas MGP plant. (*Id.* at 7211, 7226–27). Moreover, the minutes establish that American Gas's general manager Ramsdale, who was also the New Rochelle subsidiary's general manager, entered into a construction contract, later authorized by the subsidiary's board of directors and signed by its presi-

dent, showing a profit to American Gas. (*Id.* at UGI 7207). According to the minutes, American Gas assumed "control over the operations" of the New Rochelle MGP, which included changes American Gas made to the MGP's oil purchasing agreement. (*Id.* at UGI 7106).

Based on the evidence submitted, a reasonable jury could only conclude that American Gas is not directly liable as an operator of the MGPs owned by its subsidiaries. First and most importantly, the record is devoid of any evidence of American Gas's control over "operations having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations." *Bestfoods,* 524 U.S. at 66–67, 118 S.Ct. 1876; *Commander Oil,* 215 F.3d at 332 n. 3; *Green,* 33 F.Supp.2d at 217–18. Second, much of the evidence submitted pertains to the relationship between American Gas and its subsidiaries, which is largely irrelevant to the inquiry into whether American Gas is directly liable as an operator of the MGPs. *Bestfoods,* 524 U.S. at 65, 118 S.Ct. 1876. Third, evidence of overlapping corporate management is insufficient, on its own, to establish direct liability. *American Protein Corp.,* 844 F.2d at 57; *Kingston Dry Dock Co.,* 31 F.2d at 267; *Bestfoods,* 524 U.S. at 69, 118 S.Ct. 1876; *Raytheon,* 2003 WL 984623, at *4. Con Ed has failed to provide evidence to overcome the presumption that the shared officers and directors acted on behalf of the subsidiaries. *Bestfoods,* 524 U.S. at 70, 118 S.Ct. 1876. Evidence of the construction contract favorable to American Gas, entered into by Ramsdale, fails to overcome the presumption that he acted on the subsidiary's behalf because the contract was subsequently approved by the subsidiary's board of directors and signed on behalf of the company by its

president. (Gary Aff., dated Nov. 23, 2003, Exh. 1 at UGI 7207).

In the absence of American Gas's operator liability, no reasonable jury could conclude that UGI was liable as a successor when American Gas merged into UGI in 1925. Accordingly, UGI's motion for summary judgment is granted as to Con Ed's successor liability claim.

**B. *UGI's Operator Liability Based On Control Over WLC and MGP Operations at Mount Vernon, New Rochelle, Pelham, Port Chester, Rye, Tarrytown, and White Plains from 1900 to 1904***

█ Plaintiff alleges that UGI exerted direct control over WLC and the operation of the seven MGPs owned by WLC, giving rise to operator liability based on conduct from 1900 to 1904. These MGPs are located in Mount Vernon, New Rochelle, Pelham, Port Chester, Rye, Tarrytown, and White Plains.[4]

Con Ed's allegations in support of its WLC-based operator liability claim fall into two general categories. First, Con Ed alleges that several UGI officers and directors also served in management and directorship roles vis-à-vis WLC. For example, Con Ed asserts that UGI officers Louis Lillie and Walton Clark served as WLC's treasurer, assistant secretary, and managing director. (Pl.Mem.37–28). Pursuant to WLC's bylaws, Clark, as WLC's managing director, was responsible for and directed the "general management of the business properties" of WLC, including the management of the gas operations. (*Id.*). Lillie and Clark also comprised half of WLC's executive committee. (*Id.*). In addition, Lillie, Clark, and UGI employees Randal Morgan and George Philler served on WLC's board of directors. (*Id.*).

In support of its claim that UGI controlled the management and operations of WLC, Con Ed also asserts that WLC did not act or make any expenditures without UGI's approval and that UGI was appointed both the purchasing agent and consulting engineer for WLC. (*Id.*; Def. Exh. 1 at 6). Con Ed also alleges that Robert Searle, "a known UGI employee," was involved in gas operations for WLC and that UGI paid the salaries of certain alleged WLC employees. (*Id.*; Gary Aff., Exh. 18 at ENV 43).

Con Ed's allegations of dual officership and directorship are insufficient as a matter of law to establish operator liability. Lillie's and Walton's dual roles as UGI officers and WLC directors, officers, and executive committee members do not, without more, overcome the presumption that they were acting on behalf of WLC. *Bestfoods,* 524 U.S. at 69, 118 S.Ct. 1876; *American Protein Corp.,* 844 F.2d at 57; *Kingston Dry Dock Co.,* 31 F.2d at 267; *Raytheon,* 2003 WL 984623, at *4. The mere fact of Walton's dual role as a UGI officer and WLC's managing director does not mean, as a matter of law, that Walton acted on UGI's behalf. Con Ed fails to offer any evidence that either Lillie or Walton departed so far from "the norms of parental influence . . . as to serve the parent." *Bestfoods,* 524 U.S. at 71, 118 S.Ct. 1876. In fact, Con Ed fails to provide any evidence at all to illustrate the nature of Lillie's and Walton's conduct.

Con Ed's evidence of UGI's control over the management and operations of MGPs is also insufficient as a matter of law. First, UGI's approval of WLC expenditures falls within the parameters of the parent-subsidiary relationship. *See Bestfoods,* 524 U.S. at 72, 118 S.Ct. 1876 (stating that supervision of subsidiary's finance

---

4. WLC owned the MGPs at Tarrytown and White Plains from 1902 to 1904.

and capital budget decisions does not qualify as parent's control of facility's operation); *Schiavone v. Pearce*, 77 F.Supp.2d 284, 290 (D.Conn.1999) (holding that evidence of interlocking board of directors examining and approving capital expenditures, including those for pollution control equipment, was consistent with typical relationship between parent and subsidiary); *cf. Datron, Inc. v. CRA Holdings, Inc.*, 42 F.Supp.2d 736, 747 (W.D.Mich.1999) (holding that requirement for subsidiary to obtain parent's approval for credit arrangements beyond normal commercial credit accounts fell within norms of parental oversight).

Second, evidence that UGI was appointed both the purchasing agent and consulting engineer for WLC is also insufficient as a matter of law to establish UGI's control as an operator. Con Ed conclusorily alleges that, in these capacities, UGI "determined the vendors, products, and processes which would be used at the MGPs." (Pl.Opp.38). The record lacks evidence, however, supporting this general description of the consulting engineer function. Moreover, any evidence that might support Con Ed's assertion would still be insufficient as a matter of law to establish liability. Corporate decision-making of the type attributed to the consulting engineer function would fall within the contours of parental oversight. *See Bestfoods*, 524 U.S. at 72, 118 S.Ct. 1876 (stating that parent's determination of policies and procedures was consistent with parent's investor status); *Schiavone*, 77 F.Supp.2d at 292 (holding that parent's control over subsidiary's contract review, approval, and negotiation and capital expenditures comported with normal parental oversight); *Datron*, 42 F.Supp.2d at 748 (holding that parent's establishment of corporate policies applicable to subsidiary was consistent with parent's investor status). UGI's role

as WLC's purchasing agent is similarly consistent with UGI's investor status. *See id.*

Con Ed's allegation that Robert Searle, "a known UGI employee," was involved in gas operations for WLC is equally insufficient as a matter of law to establish liability. UGI, in fact, disputes Con Ed's assertion that Searle was a UGI employee, contending that Searle was never employed by UGI and was instead an employee of New York Suburban, the company UGI acquired from American Gas in March 1900. (Def. Reply 4 (citing Gary Aff., Exh. 18 at ENV 43)). Even assuming that Searle was a UGI employee, his alleged "involve[ment] in gas operations for WLC" does not amount to direct control over the MGP facilities, let alone control over the pollution and waste disposal-related activities at the sites. At best, Con Ed's allegation speaks to UGI's relationship with WLC, which is an inadequate basis for operator liability.

Lastly, Con Ed contends that UGI's payment of the salaries of certain alleged WLC employees supports its operator liability claim. According to the WLC executive committee minutes from September 18, 1902, the committee approved the salary for engineer J.A. Perry to be paid by WLC and UGI. (Def. Exh. 17 at UGI 25643–44). UGI's payment to Perry does not, however, establish that UGI controlled the operations of the MGPs. At best, it illustrates the relationship between UGI and Con Ed.

The evidence offered by Con Ed to support its WLC-based claim fails to raise an issue of fact as to whether UGI directly controlled the operations at the MGPs owned by WLC from 1900 to 1904. Moreover, the record is devoid of evidence establishing that UGI engaged in pollution or waste disposal activity at the MGPs. The mere suggestion that pollution or waste disposal operations may have been

implicated in UGI's relationship with WLC does not create an issue of fact as to UGI's operator liability. Based on the evidence submitted, no reasonable jury could conclude that UGI is subject to operator liability for activity from 1900 to 1904 at the MGPs located in Mount Vernon, New Rochelle, Pelham, Port Chester, Rye, Tarrytown, and White Plains. UGI's motion for summary judgment is granted as to this claim.

### C. *UGI's Operator Liability for Tarrytown and White Plains MGPs from 1898 to 1902*

■ Con Ed contends that UGI is liable as an operator of the White Plains and Tarrytown MGPs based on UGI's control over the subsidiaries that owned these sites from 1898 until the subsidiaries merged into WLC in 1902. (Pl.Mem.36). UGI acquired ownership interests in the White Plains Lighting Company in 1898 and the Hudson River Gas and Electric Company of Tarrytown in 1900. (Gary Aff., Exh. 29; Exh. 33 at ENV 93, 95). Con Ed bases its operator liability claim on allegations that UGI and these two subsidiaries shared officers and directors and that UGI controlled these subsidiary's operations. (Pl.Mem.36–38).

The record, however, is devoid of evidence showing that UGI directly operated the White Plains and Tarrytown MGPs from 1898 to 1902. Con Ed merely makes the conclusory statement that "UGI dominated and controlled the management and operations of the White Plains Lighting and Hudson River Gas companies prior to their merger into WLC." (Pl.Mem.36). Moreover, Con Ed fails to submit evidence establishing UGI's control over the MGPs' pollution control or waste disposal activities. Lastly, to the extent that UGI and its White Plains and Tarrytown subsidiaries shared officers and directors, Con Ed

fails to offer evidence to overcome the presumption that the officers and directors acted on the subsidiaries' behalf. *See Bestfoods,* 524 U.S. at 69–70, 118 S.Ct. 1876; *American Protein Corp.,* 844 F.2d at 57; *Kingston Dry Dock Co.,* 31 F.2d at 267; *Raytheon,* 2003 WL 984623, at *4.

A reasonable jury could only conclude, based on the evidence presented, that UGI was not directly liable for activities at the Tarrytown and White Plains sites from 1898 to 1902. Accordingly, UGI's motion is granted as to this claim.

### CONCLUSION

For the reasons set forth above, the motion is granted in its entirety and the complaint is dismissed with prejudice and with costs. The Clerk of the Court shall enter judgment accordingly.

SO ORDERED.